RONALD G. LANDRY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20585-81.          Filed June 24, 1986.

---

*Buford P. Berry, Thornton Hardie III, J.Y. Robb,* and *Dennis J. Grindinger,* for the petitioner.

*A. Shawn Noonan,* for the respondent.

SIMPSON, *Judge*: The Commissioner determined a deficiency of $18,328.69 in the petitioner's Federal income tax for 1977. After a concession by the petitioner, the issues for decision are: (1) Whether Woodscape Associates, Ltd., a limited partnership formed to construct and operate an apartment project in 1977, was engaged in such activity for profit in that year; and (2) whether Woodscape is entitled to deductions claimed by it for the amounts of the purchase price of the apartment project allocated by it to interest and to the payment of certain fees.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

Petitioner Ronald G. Landry maintained his legal residence in Galveston, Texas, at the time of the filing of his petition herein. He filed a timely individual Federal income tax return for 1977 with the Internal Revenue Service Center, Austin, Texas.

Woodscape Associates, Ltd. (Woodscape), is a limited partnership organized and operated under the laws of the State of Texas. Woodscape was formed pursuant to an Agreement of Limited Partnership dated June 28, 1976 (partnership agreement), and its principal place of business is in Dallas, Texas. Woodscape maintains its books and records and files its partnership returns using the accrual

method of accounting; it uses a calendar year period for Federal income tax purposes.

Woodscape has two managing general partners, one special general partner, and 26 limited partners. John S. Schneider and Robert F. Sherman are the managing general partners; Dr. Jerry A. Argovitz is the special general partner; and the petitioner is one of the limited partners.

Woodscape was formed for the purposes of acquiring from Jagger Associates, Inc. (Jagger), 11.6187 acres of land in Houston, Texas, constructing a 368-unit garden apartment project on such land, and operating and managing the project. Subsequent to its formation, all of the partners agreed to expand the scope of Woodscape's activities to include acquiring an additional 3.4126 acres of land from Jagger immediately adjacent to the 11.6187-acre parcel, constructing a 112-unit addition to the apartment project, and operating and managing the additional project. The activities and documents associated with the intitial 368 apartment units shall be referred to as "phase I" of the Woodscape project, and the activities and documents associated with the additional 112 units shall be referred to as "phase II" of the Woodscape project.

Under the terms of the partnership agreement, all income, gains, losses, deductions, and credits are allocated 90 percent to the limited partners and 10 percent to the general partners for Federal income tax purposes. The partnership agreement provides that distributions of net cash-flow from operations shall be "to the extent feasible, quarter-annually within forty-five (45) days after the end of each calendar quarter."

The 10-percent interest of the general partners in distributions of Woodscape is subject to a noncumulative annual cash-flow distribution priority in favor of the limited partners equal to 8.5 percent of the capital contributions made by the limited partners. Upon sale or other disposition of Woodscape's property, the partnership agreement provides that the general partners receive a distribution priority to the extent that their share of distributions from operations has previously been distributed to the limited partners in accordance with the distribution priority provision. The partnership agreement further provides that all

distributions in excess of the distribution priorities are shared 90 percent to the limited partners and 10 percent to the general partners.

Prior to the formation of Woodscape, Mr. Schneider and Mr. Sherman had extensive experience in real estate ventures. After receiving his MBA from Harvard University in 1967, Mr. Schneider worked for Donaldson, Lufkin & Jenrette, Inc., as a financial analyst in the firm's institutional marketing division, raising capital for real estate pooled investments. In 1972, Mr. Schneider formed his own real estate investment company, Rohdie-Schneider Associates, Inc. Mr. Sherman joined Mr. Schneider at Rohdie-Schneider Associates in December 1973. Prior to that time, Mr. Sherman had been associated with First National City Bank in New York City (currently Citibank). In 1974, they formed Schneider & Sherman Associates, Inc., a real estate investment corporation and, at all times relevant hereto, owned 100 percent of the stock.

As of June 1976, Mr. Schneider and Mr. Sherman were general partners in 12 real estate limited partnerships which were organized to develop and operate garden apartment projects. Nine of these projects are located in Texas. Five of these nine projects had been completed at the time Woodscape was formed. As of June 1976, the occupancy level of these five completed projects ranged between 83 percent and 100 percent. One of the five Texas projects was sold for a substantial profit in 1983, while each of the other projects has been operating, and continues to operate, at a profit.

Mr. Schneider was primarily responsible for making the economic projections with respect to the proposed acquisition, construction, operation, and management of the Woodscape project. He was also primarily responsible for negotiating the land purchase and construction contracts with Jagger. In addition, he extensively analyzed and reviewed the economic aspects of this proposed garden apartment project. Based on his analysis, Mr. Schneider expected a capital appreciation on the amount paid for the Woodscape project.

Woodscape generated and distributed a positive cash-flow of $82,000 in 1979. In each year subsequent thereto until

1984, it continued to generate a substantial positive cash-flow. In 1984, an unexpected downturn in the Houston rental market caused a significant drop in Woodscape's occupancy rate resulting in a significant negative cash-flow. Woodscape's operations reflected a net taxable income for the year 1982.

Limited partnership interests in Woodscape were offered to selected individuals, including the petitioner, during 1976. In connection with this offering, a Confidential Private Placement Memorandum was prepared in June 1976. This memorandum provided prospective limited partners with detailed information regarding an investment in phase I of the Woodscape project.

On July 24, 1976, the petitioner purchased a 2.25-percent limited partnership interest in Woodscape. In exchange, the petitioner contributed capital of $9,375 in cash and unconditionally agreed to pay an additional $25,000 in two equal installments of $12,500 each. The installments were timely paid in May 1977 and in March 1978.

In January 1977, a second Confidential Private Placement Memorandum was prepared to present prospective limited partners with detailed information regarding an investment in phase II of the Woodscape project. The limited partners in phase I, including the petitioner, agreed to make additional capital contributions to the partnership to develop phase II of the project in the same proportion as their interests in phase I. Consequently, the petitioner maintained his 2.25-percent limited partnership interest in Woodscape. He contributed $4,750 in cash in February 1977 and unconditionally agreed to pay an additional $5,750 in two installments. The first installment of $3,125 was timely paid in January 1978, and the second installment of $2,625 was timely paid in October 1978.

At the time the Woodscape project was constructed, Jagger was one of the top 10 builders of multiple residential housing in the country. From its formation in 1964 until commencing construction on the Woodscape project, Jagger had built approximately 6,000 apartment units in Texas. Jagger had leased and managed apartments for over 10 years and was managing more than 800 units in Dallas and Houston as of June 1976.

Woodscape contracted with Jagger for the acquisition of the land and the construction of the initial 368-unit apartment project pursuant to the Purchase and Construction Agreement entered into as of June 28, 1976 (P & C agreement—phase I). This agreement was a completed contract under which Jagger agreed to convey 11.6187 acres of land to Woodscape, construct a 368-unit apartment project on such land, and perform certain other services and commitments stated therein for a total price of $5,775,000. This contract price covered the cost of the land and the improvements to be constructed thereon, all compensation to Jagger for various commitments, all syndication and organization expenses, and all of the amounts denominated as "interest"[1] on the wraparound loan.

Subsequently, Woodscape contracted with Jagger for the acquisition of additional land and the construction of 112 additional apartment units pursuant to the Purchase and Construction Agreement entered into as of February 15, 1977 (P & C agreement—phase II). That agreement was also a completed contract under which Jagger agreed to convey 3.4126 acres of land to Woodscape, construct 112 apartment units on such land, and perform certain other services and commitments stated therein for a total price of $1,690,000. This contract price covered the cost of the land and the improvements to be constructed thereon, all compensation to Jagger and its affiliates for various commitments, all syndication and organization expenses, and all of the amounts denominated as "interest" on the wraparound loan.

Woodscape's cost basis in the 11.6187 acres of land purchased in connection with the development of phase I is $771,587. Jagger conveyed the property to Woodscape by a general warranty deed dated June 28, 1976, subject to an interim construction loan in the amount of $4,400,000 from Citizens Mortgage Corp. to Jagger. At the time of the closing of the P & C agreement—phase I, Woodscape paid Jagger $375,000 and also executed a wraparound promis-

---

[1] Use herein of such terms as "interest," "pay," "payable," or "payment" should not be construed as carrying any conclusion as to the legal effect of the documents or transactions involved.

sory note (phase I note) in favor of Jagger in the amount of $5,400,000 (which stated that it bore interest at 12 percent per annum), a deed of trust, and a security agreement, all dated June 28, 1976.[2] The downpayment was stated to consist of $260,000 of interest on the wraparound loan, $40,000 for the leasing and advertising fee, $44,000 for the standby financing fee, $10,000 for the covenant not to compete, and $21,000 for the decorating and furniture handling fee. Pursuant to this conveyance, Woodscape has been and is the sole and exclusive owner of the 11.6187 acres of land. The addendum to the phase I deed of trust provides that the principal balance of the phase I note includes, or "wraps," the stated principal amount of the interim construction note of $4,400,000 executed by Jagger to Citizens Mortgage Corp.

The phase I note obligated Woodscape to pay three installments: two $500,000 payments and one $4,400,000 payment. The first installment was payable on the latest to occur of (1) July 15, 1977, (2) certification by Woodscape's architect that 60 percent of the construction had been satisfactorily completed, and (3) receipt by Woodscape of certificates of occupancy on 148 units. The amount of the first installment on the phase I note was stated to consist of $436,000 of interest on the phase I note, $40,000 for payment of the leasing and advertising fee, and $24,000 for partial payment on Jagger's covenant not to compete.

The second installment on the phase I note was payable on the latest to occur of (l) March 15, 1978, (2) the completion of the construction and the funding of the permanent loan with regard to the first phase of the project, and (3) the payment and satisfaction of the construction loan between Jagger and Citizens Mortgage Corp. The amount of the second installment on the phase I note was stated to consist of $317,000 of interest on the phase I note, $38,000 for partial payment for Jagger's covenant not to compete, $63,000 for payment for furniture, and $92,000 for depreciable improvements to the extent the interest

---

[2] The phase I deed of trust was subsequently amended to correct an error in the description of the phase I note and was filed of record in the office of the County Clerk for Harris County, Texas.

expense on the phase I note was not in excess of the anticipated amounts.[3]

The amount of the final installment on the phase I note was composed of the amounts necessary to retire and satisfy the outstanding balance of the construction loan from Citizens Mortgage Corp. to Jagger. Woodscape and Jagger anticipated that the final installment on the phase I note of $4,400,000 would be paid out of the proceeds of the permanent loan in that amount to be made by The Travelers Insurance Co. (Travelers) to Woodscape. Woodscape made all payments to Jagger pursuant to the phase I note in a timely manner.

Although Woodscape expected Jagger to begin construction of the 28 two-story buildings and 1 one-story building comprising phase I of the project on or about August 15, 1976, construction did not commence until November 1976. Under the terms of the P & C agreement—phase I, Jagger was obligated to (1) construct the improvements in accordance with detailed specifications, (2) pay all fees, costs, and expenses arising from the construction of the improvements (including all charges and interest arising from the construction loan), (3) designate Woodscape as owner on all policies of insurance, and (4) deliver and adhere to a schedule of construction.

Under the terms of the P & C agreement—phase I, the construction of phase I was expected to be completed on or before December 31, 1977. Units in phase I were completed on a continuing basis from August 1977 forward. Prior to January 1, 1978, Woodscape had received certificates of occupancy for 272 apartment units. A number of apartment units were leased and occupied in 1977, and Woodscape received $42,361 in rental income in 1977.

Certificates of occupancy were issued for the remaining phase I units on or before February 1, 1978. At all times pertinent hereto, Woodscape was the sole and exclusive owner of the 368-unit garden apartment project constructed pursuant to the P & C agreement—phase I.

---

[3] The wraparound note for phase I states that this $500,000 payment shall be allocated as follows: $317,000 as interest and $183,000 as principal for purposes specified in the P & C agreement. However, the amounts specified in the P & C agreement allocable to items other than interest total $193,000, and this discrepancy is not explained in the record.

As part of phase II, Woodscape purchased the additional 3.4126 acres of land from Jagger for $285,000 pursuant to the P & C agreement—phase II. Jagger conveyed the land to Woodscape by general warranty deed dated February 15, 1977, subject to an interim construction loan in the amount of $1,270,000 from BA Mortgage Co., Inc. At the time of the closing of the P & C agreement—phase II, Woodscape paid Jagger $190,000 of the total purchase price of $1,690,000 and executed a $1,500,000 wraparound promissory note (phase II note) payable to Jagger (which stated that it bore interest at 12 percent per annum), and a deed of trust, both dated February 15, 1977. This downpayment was stated to consist of $120,000 of interest on the wraparound loan, $24,000 for the leasing and advertising fee, $13,000 for the standby financing fee, $10,000 for the covenant not to compete, $6,000 for the decorating and furniture handling fee, and $17,000 for the commitment to finance cost overruns. Pursuant to this conveyance, Woodscape has been and is the sole and exclusive owner of the 3.4126 acres of land. The addendum to the phase II deed of trust specifically states that the principal balance of the phase II note which it secures includes, or "wraps," the stated principal amount of the construction note of $1,270,000 executed by Jagger to BA Mortgage Co., Inc.

The phase II note obligated Woodscape to pay three separate installments: one $37,000 payment, one $64,000 payment, and one $1,270,000 payment. The first installment on the phase II note was payable on the latest to occur of (1) January 1, 1978, (2) certification by Woodscape's architect that the construction of phase II had been satisfactorily completed, and (3) closing of the permanent loan on phase I of the project. The amount of the first installment on the phase II note was stated to be composed entirely of interest on such note.

The second installment on the phase II note was payable on the latest to occur of (1) October 1, 1978, (2) completion of the construction and funding of the permanent loan with regard to the second phase of the project, and (3) payment and satisfaction of the construction loan between Jagger and BA Mortgage Co., Inc. The amount of the second installment on the phase II note was stated to be composed

of $10,000 of interest on the phase II note, $20,000 for payment of Jagger's covenant not to compete, and $35,000 for payment of Jagger's commitment to provide funding of any net operating losses.[4]

The final installment on the phase II note was composed of the amounts necessary to retire and satisfy the outstanding balance of the construction loan from BA Mortgage Co., Inc., to Jagger. Woodscape and Jagger anticipated that the final installment on the phase II note would be paid out of the proceeds of the permanent loan to be made by Travelers to Woodscape. Woodscape made all payments to Jagger on the phase II note in a timely manner.

The construction of phase II of the Woodscape project was performed by Jagger Construction Co., Inc. (Jagger Construction), which was, at that time, a recently formed subsidiary of Jagger. Jagger Construction began construction of the 112-unit addition in May 1977.

Under the terms of the P & C agreement—phase II, Jagger Construction was required to (1) construct phase II improvements for Woodscape in accordance with detailed specifications, (2) pay all fees, costs, interest, and expenses arising from the construction of the improvements (including all charges and interest arising from the construction loan), (3) designate Woodscape as owner on all policies of insurance, and (4) deliver and adhere to a schedule of construction.

The apartment units in phase II were completed on a continuing basis beginning in January 1978 and ending in April 1978. Certificates of occupancy were issued for the 112 apartment units in phase II of the Woodscape project on or before April 18, 1978. At all times pertinent hereto, Woodscape was the sole and exclusive owner of phase II.

The collateral stated to secure the deeds of trust for phases I and II included the land itself, all machinery, equipment, apparatus, and fixtures on the land either at the time the instrument was executed or at any time subsequent thereto, all buildings and improvements located thereon or subsequently placed thereon, and all appurte-

---

[4] There is a discrepancy between the $64,000 second installment on the phase II note and the allocation of that total payment in the P & C agreement—phase II. These allocations total $65,000, and this discrepancy is not explained in the record.

nances, servitudes, and rights of way pertaining to the land. However, there was no existing tangible personal property or other assets to which the security agreement could attach on the date of the execution of the deed of trust.

The parties contemplated that the construction loan would remain the obligation of Jagger, even though the construction loan agreements were collaterally assigned to Woodscape as security for Jagger's performance of its obligations under the P & C agreements. Jagger made all interest payments in connection with the construction loans in a timely manner.

Under the terms of the P & C agreements, Woodscape was entitled to (1) review and approve each construction draw request submitted by Jagger, or Jagger Construction, to the construction lender, (2) send its architect on site on a monthly basis to inspect the ongoing construction, (3) cause Jagger, or Jagger Construction, to correct any deficiencies in construction, (4) require Jagger, or Jagger Construction, to remove any subcontractor's liens which might be filed against the property, and (5) make design changes.

Woodscape hired an architectural firm, Architectural Development Corp. to perform on-site inspections of the construction of the project. The firm made inspections on a monthly basis, prepared reports summarizing its findings, and made various recommendations to Woodscape concerning the construction.

Travelers was the permanent lender on both phases of the Woodscape project. Woodscape, through Jagger, obtained a commitment from Travelers on August 27, 1976, to make the phase I permanent loan in the amount of $4,400,000 at an interest rate of 9¾ percent. On March 15, 1977, Woodscape obtained a commitment from Travelers to make the phase II permanent loan in the amount of $1,270,000 at an interest rate of 9½ percent. As security for these permanent loans, Travelers was to receive a first lien deed of trust to the land and the apartment units to be constructed in phases I and II.

Prior to extending a permanent loan commitment, Travelers routinely asked the applicant or borrower for information regarding the contemplated security for the loan. Prior to making the commitment for the permanent loans, Travel-

ers asked Jagger to submit information about the cost or value of the contemplated security for those loans. Jagger submitted the requested information to Travelers.

In connection with making the commitment for the permanent loan for phase I, Travelers possessed the following estimate of costs:

| | |
|---|---|
| Main buildings | $3,675,000 |
| Parking, paving | 350,000 |
| Architectural and engineering | 40,000 |
| All financing costs | 350,000 |
| Legal and closing, etc. | 25,000 |
| Walks, pool, landscaping | 100,000 |
| Land | 786,000 |
| Overhead and profit | 550,000 |
| Total | 5,876,000 |

In connection with making the commitment for the permanent loan for phase II, Travelers possessed the following estimate of costs:

| | |
|---|---|
| Gross building costs | $1,000,000 |
| Interim and permanent costs | 150,000 |
| Walk, drives, carpet, landscaping | 175,000 |
| Legal and closing | 7,500 |
| Architectural and engineering | 12,500 |
| Overhead and profit | 150,000 |
| Land | 290,000 |
| Total | 1,785,000 |

In connection with each permanent loan, Travelers prepared an application for mortgage loan for presentation to, and approval by, its loan committee. Prior to committing to make the permanent loans to Woodscape, Travelers inspected the site on which the apartment units were to be built and had its architect review the plans and specifications to ensure that the improvements would be adequate security for the loans.

Travelers made an estimate of the value of the land and improvements that were to secure each of the loans to Woodscape. It was important to Travelers that its conclusion as to the value of the security for its loans be accurate. Travelers attempted to determine what a willing buyer would pay a willing seller for the land and improvements

upon completion of those improvements. Its estimate of value did not take into account the value of furniture or whether the improvements were fully leased. Travelers' estimated value for the phase I land and improvements was $5,871,000, and its estimated value for the phase II land and improvements was $1,708,000.

Travelers used the architect's plans and specifications submitted by Jagger on behalf of Woodscape in making its estimates of the value of the phase I and II land and improvements. Travelers' policy was to loan no more than 75 percent of the estimated value of the security for its loans, and it adhered to this policy in making the two permanent loans to Woodscape.

In addition to its contractual commitment to construct the two phases of the Woodscape project, Jagger and its affiliates contracted to provide certain services, guarantees, and covenants. Under the P & C agreement—phase I, Jagger agreed not to construct or participate in constructing any other multiple residence projects on any site located within a 1-mile radius of phase I of the Woodscape project for 1 year beginning June 28, 1976. For an additional 2 years thereafter, Woodscape had a right of first refusal in any competing apartment project within the same 1-mile radius constructed by Jagger or its affiliates. Under the P & C agreement—phase II, Jagger agreed not to construct or participate in the construction of any other multiple residence projects on any site located within a 1-mile radius of phase II of the Woodscape project for 1 year beginning February 15, 1977. Woodscape had a right of first refusal with regard to any such project for an additional 2 years constructed by Jagger or its affiliate. The P & C agreements provided that even if Woodscape declined to participate in a multiple residential project located within the protected area, Jagger and its affiliates were prohibited from participating in leasing or managing such a project during the last 2 years of each of the covenant periods, unless the rental charges of such project (on a square foot basis) equaled or exceeded Woodscape's projected rentals and its gross rental income had reached $70,000 per month on phase I and $18,800 per month on phase II.

There was abundant land available that could be developed as apartment projects within the area directly surrounding the Woodscape project. However, Woodscape did not determine whether Jagger owned any land within the protected area prior to entering into the P & C agreements. The protected area consisted of approximately 10.82 square miles surrounding the Woodscape project.

The consideration stated in the P & C agreements for the covenant not to compete with regard to phase I was $72,000, payable $10,000 in 1976, $24,000 in 1977, and $38,000 in 1978. The stated consideration for the covenant not to compete with regard to phase II was $30,000, payable $10,000 in 1977, and $20,000 in 1978. Woodscape amortized the aggregate cost of these covenants not to compete over their 36-month lives on a straight-line basis. On its 1977 return, Woodscape deducted $32,750 in connection with the two covenants consisting of $24,000 pursuant to the covenant on phase I and $8,750 pursuant to the covenant on phase II.

Pursuant to the P & C agreements, Jagger obtained the permanent financing for each phase of the Woodscape project from Travelers and assigned the permanent loan commitments to Woodscape. Jagger agreed to make a loan to Woodscape in the same amount and under terms no less advantageous to Woodscape than the permanent commitment made with respect to each phase of the project if, for any reason, the permanent lender failed to fund the permanent loan. The agreed consideration for this guarantee by Jagger was 1 percent of the total amount of the permanent loans commitment. The parties anticipated that the amounts of the permanent loans would be $4,400,000 for phase I and $1,270,000 for phase II. Woodscape paid Jagger standby financing commitment fees of $44,000 in 1976 and $13,000 in 1977 with respect to phases I and II of its project. The parties have stipulated that if we find that Woodscape had a good-faith profit objective in 1977, then the $13,000 fee paid for this commitment was properly reported as an expense in that year.

The P & C agreement—phase II stated that for a fee of $17,000, Jagger and its principal shareholder, Sid Jagger, agreed to fund Jagger Construction to the extent of any

construction cost overruns associated with the construction of phase II of the Woodscape project. In 1977, Woodscape paid $17,000 (approximately 1 percent of the total turnkey price of phase II) to Jagger for this stated purpose. Woodscape amortized the fee over a 16½ month period on a straight-line basis. This period was equal to the length of the anticipated construction period for phase II. Woodscape deducted $13,730 of such fee on its 1977 return.

The general partners of Woodscape believed that, in order to be competitive in the Houston apartment market, it was necessary to offer a number of furnished apartments. Jagger agreed to select, purchase, store, and initially install furniture in 116 units in phase I of the Woodscape project and in 36 units of phase II. Jagger was also responsible for matching color and design of the furniture with the floor plan of the unit. In addition, because the apartment project had no storage facilities, Jagger was responsible for accepting delivery and storing the furniture until needed. According to the P & C agreements, Jagger received a fee of $21,000 with respect to phase I and $6,000 with respect to phase II in connection with these services. These amounts represent 25 percent of the estimated cost of the furniture. Woodscape deducted the entire $27,000 on its 1977 return as decorating and furniture handling fees.

Woodscape and Jagger also executed a leasing and management agreement dated June 28, 1976 (L & M agreement—phase I). Under such agreement, Jagger agreed to manage phase I during the initial lease—up through September 30, 1978. All residential leases accepted by Jagger as agent under the L & M agreement—phase I were required to be either at a specified minimum rental rate and in accordance with a pre-approved form or subject to prior approval by Woodscape. Additionally, Jagger was obligated to staff and maintain a leasing office at the Woodscape project. Jagger was also obligated at its sole expense to carry on approved advertising and promotional programs to facilitate the leasing of apartment units in phase I of the project. Finally, Jagger was obligated to establish and maintain a number of model units in the project.

Under a similar agreement (L & M agreement—phase II), dated February 15, 1977, Jagger Management, Inc. (Jagger

Management), a wholly owned subsidiary of Jagger, managed phase II of the project during the initial leaseup period through December 31, 1978. Under the L & M agreement—phase II, Jagger Management was responsible for performing the same functions with regard to phase II as Jagger performed with regard to phase I of the Woodscape project.

The L & M agreement—phase I provided that Jagger was to receive a one-time leasing and advertising fee of $80,000. On its returns, Woodscape deducted $40,000 in 1976 and $40,000 in 1977. The L & M agreement—phase II provided that Jagger Management was to receive a one-time leasing and advertising fee of $24,000, all of which Woodscape deducted on its return for 1977.

The L & M agreement—phase I also provided that Jagger would fund any net operating losses from phase I until the breakeven point was achieved. Thereafter, Jagger was required to fund net operating losses to a limited extent for a limited period. The breakeven point was reached when the gross receipts reached the rate of $906,000 a year. Under the L & M agreement—phase II, Jagger Management undertook to fund any net operating losses from phase II until the breakeven point was achieved and thereafter to fund net operating losses to a limited extent for a limited period. For phase II, the breakeven point was reached when the gross receipts achieved an annual rate of $245,000. The L & M agreements provided no separately stated consideration for the obligations to fund net operating losses.

The P & C agreement—phase II also provided that Jagger agrees to supply Jagger Management, its newly formed subsidiary, with any funds necessary to honor Jagger Management's undertaking to fund net operating losses in exchange for a fee of $35,000. However, Woodscape also secured the personal guarantee of Sid Jagger, the founder and largest shareholder of Jagger and all of its affiliates, to perform all obligations incurred by Jagger and its affiliates pursuant to the P & C agreements. Woodscape amortized this $35,000 fee on a straight-line basis over a 19½ month period, the expected duration of the commitment. Woodscape claimed a deduction of $18,850 on its 1977 return.

In addition, under the L & M agreement—phase I, Jagger was entitled to receive an incentive management fee of up to 45 percent of gross receipts from operations of phase I payable out of net cash-flow from operations from June 28, 1976, until September 30, 1978, unless terminated sooner. Under the L & M agreement—phase II, Jagger Management was entitled to receive an incentive management fee of up to 60 percent of gross receipts from operations of phase II payable out of net cash-flow from operations from February 15, 1977, until December 31, 1978, unless terminated sooner. On its return for 1977, Woodscape described the incentive management fee as "contribution to agent during breakeven" and claimed a deduction therefor in the amount of $21,105.

Pursuant to the P & C agreement—phase I, Jagger was obligated to pay S & S Securities, Inc. (S & S), a registered broker-dealer owned by the managing general partners of Woodscape, $206,000 for its services in organizing and selling the interests in Woodscape. Such fee was to be paid in installments—$56,000 at the closing of the P & C agreement—phase I, $75,000 at the time of the payment of the first installment under such agreement, and $75,000 at the time of the payment of the second installment under such agreement.

Under the P & C agreement—phase II, Jagger was obligated to pay S & S $65,000 for its services in organizing and selling the interests in phase II of Woodscape. Such fee was to be paid in installments—the first installment of $30,000 was due on the closing of the P & C agreement—phase II, the second installment of $20,000 was due at the time of the payment of the first installment under such agreement, and the third installment of $15,000 was due at the time of the payment of the second installment under such agreement.

Prior to entering into the P & C agreements, Jagger made estimates of its direct and indirect costs, and it anticipated the types of expenses actually incurred in connection with the Woodscape project. Jagger's actual expenses were $5,281,510.15 for phase I and $1,609,340.96 for phase II. Jagger or its affiliates deducted these amounts on their Federal income tax returns.

Pursuant to the P & C agreement—phase I, Jagger reported total income of $5,775,000 for Federal income tax purposes. Pursuant to the P & C agreement—phase II, Jagger reported total income of $1,637,000, and Jagger Management reported total income of $24,000, for Federal income tax purposes. The amounts of income received by Jagger and Jagger Management pursuant to the P & C agreements and reported by them include their compensation for the construction of the Woodscape project and all their services, commitments, and guarantees given by them under such contracts, but such amounts do not include the incentive management fees received by Jagger and Jagger Management pursuant to the L & M agreements. During all relevant times, Jagger and its affiliates were in the construction business to make a profit. Jagger considered the amounts allocated to interest and fee income in the P & C agreements in determining whether it could make a profit on the two phases of the Woodscape apartment project.

The following table reflects the income, expenses, and net loss reported by Woodscape on its 1977 partnership return and deducted by the petitioner on his 1977 income tax return with respect to his pro rata share thereof:

| Item | Partnership amount | Petitioner's share |
|---|---|---|
| Income: | | |
| Gross rents from apartments | $42,361 | $953 |
| Gross rents from furniture | 3,469 | 78 |
| Other income | 1,059 | 24 |
| Total income | [1]46,886 | 1,055 |
| Expenses: | | |
| Depreciation[2] | 130,304 | 2,932 |
| Interest | 778,000 | 17,505 |
| Covenant not to compete | 32,750 | 737 |
| Leasing and advertising fee | 67,385 | 1,516 |
| Contribution to agent | 21,105 | 475 |
| Decorating and furniture handling fee | 27,000 | 607 |
| Commitment to fund cost overruns | 13,730 | 309 |
| Commitment to fund net operating losses | 18,850 | 424 |
| Other expenses | 120,887 | 2,710 |
| Total expenses | 1,210,011 | 27,225 |
| Total income | 46,886 | 1,055 |

| | | |
|---|---|---|
| Less total expenses | $1,210,011 | $27,225 |
| Plus adjustments to income | 766 | 17 |
| Total partnership loss | 1,162,359 | 26,153 |

[1]Although the parties stipulated to the correctness of the above table, it is clear that the listed income items of the partnership total $46,889 rather than the stipulated figure of $46,886. In addition, the listed partnership expenses allocated to the petitioner total $27,215 rather than the stipulated figure of $27,225.

[2]The parties have agreed to a schedule which sets forth the useful life, component allocation, and minimum basis of Woodscape in its depreciable assets in 1977. They further agreed that in order to calculate Woodscape's depreciation deduction for 1977, the proper percentage of a full year's depreciation expense for all depreciable assets owned by Woodscape is 20 percent. The petitioner and the Commissioner have also agreed that the minimum amount of the deduction for depreciation allocable to the rental furniture for calendar year 1977 is $10,250 and that the minimum amount of the deduction for depreciation allocable to nonrental furniture for calendar year 1977 is $250.

In the notice of deficiency, the Commissioner disallowed the entire amount of the petitioner's proportional share of Woodscape's net loss in 1977. The Commissioner now concedes that the depreciation and "Other expenses" are deductible if we find that Woodscape was engaged in an activity for profit in 1977.

## OPINION

The Commissioner makes a several-pronged attack on the petitioner's claimed deduction of his share of the loss from Woodscape in 1977. First, he contends that Woodscape lacked a profit motive in that year, and therefore, the partnership is entitled only to those deductions allowable under section 183(b) of the Internal Revenue Code of 1954.[5]

Section 183(a) provides that if an individual does not engage in an activity for profit, the deductions arising out of such activity shall not be allowed except as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Otherwise, section 183(b)(1) allows those

[5] All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.

deductions which would be available without regard to whether or not such activity is engaged in for profit. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from that activity for the taxable year exceeds the deduction allowable by reason of paragraph (1)."

The law is well settled that to constitute the carrying on of a trade or business, the activity must be engaged in with an "actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Capek v. Commissioner*, 86 T.C. 14, 36 (1986); *Fuchs v. Commissioner*, 83 T.C. 79, 97-98 (1984); *Dean v. Commissioner*, 83 T.C. 56, 73-77 (1984). A profit objective is also necessary in order to deduct expenses under section 212(1) or (2). *Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981); *Jasionowski v. Commissioner*, 66 T.C. 312, 320 (1976).

Although a reasonable expectation of profit is not required, the activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Brannen v. Commissioner*, 78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Thus, "profit" in this context means economic profit, independent of tax savings. *Beck v. Commissioner*, 85 T.C. 557, 570 (1985); *Herrick v. Commissioner*, 85 T.C. 237, 254 (1985); *Surloff v. Commissioner*, 81 T.C. 210, 233 (1983).

Where a partnership is involved, the analysis of profit objective must be made at the partnership level because the individual limited partners have no control over the activities of the partnership and the deductions taken in the business conducted by the partnership. *Brannen v. Commissioner*, 78 T.C. at 505; *Ramsay v. Commissioner*, 83 T.C. 793, 811 (1984). Thus, the proper focus is on the activities and intent of the general partners and promoters. *Fox v. Commissioner*, 80 T.C. 972, 1006-1007 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. without published opinion sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt*

*v. Commissioner, Zemel v. Commissioner,* 734 F.2d 5-7, 9 (3d Cir. 1984), affd. sub nom. *Barnard v. Commissioner,* 731 F.2d 230 (4th Cir. 1984).

The issue of whether the requisite profit motive exists is one of fact to be resolved on the basis of all the evidence in the case. *Sutton v. Commissioner,* 84 T.C. 210, 221 (1985); *Brannen v. Commissioner,* 78 T.C. at 506; *Dunn v. Commissioner,* 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). In making this determination, more weight must be given to the objective facts than to the taxpayer's mere after-the-fact statements of intent. *Thomas v. Commissioner,* 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); *Engdahl v. Commissioner,* 72 T.C. 659 (1979). The petitioner bears the burden of proving that Woodscape possessed the required profit objective. Rule 142(a), Tax Court Rules of Practice and Procedure[6]; *Welch v. Helvering,* 290 U.S. 111 (1933).

Section 1.183-2(b), Income Tax Regs., provides the following nonexclusive list of relevant factors gleaned from prior case law to be considered in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. *Brannen v. Commissioner,* 78 T.C. at 507. None of these factors is conclusive, and the importance of any one factor must be evaluated in the context of each particular case. *Dunn v. Commissioner,* 70 T.C. at 720.

On brief, the Commissioner states that he "does not dispute that Woodscape's long range goal was to realize a profit from the operation and perhaps eventual sale of the Woodscape apartments." However, he argues that no deductions are allowable under section 162 or 212 (1) or (2)

---

[6] Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

"unless the taxpayer has a primary good faith *intent to earn a profit during the taxable year* in which the deductions are claimed" (emphasis added), and he relies on *Jasionowski v. Commissioner*, 66 T.C. at 319. In that case, the petitioners had been given a house by a longtime friend who had become infirm and destitute. The petitioners leased the house back to the friend for 7 years, but under the terms of the lease, they could never recover even their fixed out-of-pocket expenses (taxes, insurance, and interest). In holding that the leasing activity was not entered into for profit, the Court observed that:

> We simply are unable to understand how we can impute a profit motive to petitioners when they voluntarily entered into a lease agreement under which, *for a period of 7 consecutive years*, they were bound to incur losses as distinguished from the usual "start-up" situation where early losses are anticipated but where effort and imagination could turn the venture toward profits rather quickly. [66 T.C. at 322; emphasis added.]

The Commissioner maintains that the facts of this case are similar in that Woodscape structured the transaction so that it could not make a profit in 1977.

Section 183(a) states only that "In the case of an activity engaged in by an individual * * * , if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Moreover, section 183(d) provides a presumption that an activity is engaged in for profit "If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity." The very existence of such a presumption in the statute negates a finding that Congress intended to require that a taxpayer have a "primary good faith intent" to earn a profit from the activity during each taxable year. Rather, section 183(d) provides tacit recognition that many businesses[7] are fraught with losses during their startup years. See *Jasionowski v. Commissioner, supra* at 322; *Bessenyey v.*

---

[7] We use the term "business" in this discussion in a generic sense to apply also to those activities which do not rise to the level of a trade or business under sec. 162 but are engaged in for profit under sec. 212(1) and (2).

*Commissioner*, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(b)(6), Income Tax Regs. Losses in the early years of a business are quite common, particularly where significant improvements are made to land. *Engdahl v. Commissioner, supra* at 669; *Allen v. Commissioner*, 72 T.C. 28 (1979). Indeed, in many instances, only a naive business person would be able to muster a good-faith intent that his fledgling enterprise produce a profit during each taxable period. The statute mandates only that the activity be entered into or continued with an actual and honest objective that it become profitable within a reasonable time. *Dreicer v. Commissioner*, 78 T.C. at 645; *Brooks v. Commissioner*, 50 T.C. 927, 932-933 (1968), revd. on another ground 424 F.2d 116 (5th Cir. 1970).

The Commissioner recognizes that Woodscape had a long-range profit objective, and we are satisfied that it intended to make a profit within a reasonable time. The Woodscape project was organized, constructed, and managed in a businesslike manner by persons experienced in the construction and management of apartment projects. They made economic projections showing that a profit would be realized in a reasonable time; a positive cash-flow was achieved by 1979, and taxable income was earned by 1982. Under these circumstances, we hold that Woodscape had the required profit objective in 1977, and accordingly, it is entitled to the deductions which have been challenged by the Commissioner solely on the ground that Woodscape was not engaged in carrying on a business for profit in that year.

The next issue for decision is whether Woodscape is entitled to its claimed deduction of $778,000 for interest accrued in 1977. The Commissioner argues that the wrap-around loans from Jagger to Woodscape did not constitute genuine indebtedness but rather were contrived solely to disguise capital expenditures as deductible interest and had no independent business purpose. The Commissioner recognizes that Woodscape and Jagger engaged in arm's-length negotiations to determine the total purchase prices for phases I and II and to determine the services, commitments, and guarantees to be furnished by Jagger and its affiliates. However, the Commissioner maintains that the

wraparound loans were not the subject of arm's-length negotiation, that the amounts allocated to the payment of interest had no basis in economic reality, and that such amounts are not deductible as interest but must be treated as a part of the purchase price for the Woodscape project.

Deductions are a matter of legislative grace, and taxpayers must satisfy the specific statutory requirements entitling them to the claimed deductions. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934); *Davis v. Commissioner*, 81 T.C. 806, 815 (1983), affd. in an unpublished opinion 767 F.2d 931 (9th Cir. 1985). Taxpayers are entitled to reduce their taxes by any deductions allowable to them, and they need not arrange their affairs in a manner that requires them to pay more taxes. *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Palmer v. Commissioner*, 62 T.C. 684 (1974), affd. 523 F.2d 1308 (8th Cir. 1975). However, the economic reality of a transaction, rather than the form in which it is cast, governs for Federal income tax purposes. *Court Holding Co. v. Commissioner*, 324 U.S. 331, 334 (1945); *Thompson v. Commissioner*, 631 F.2d 642 (9th Cir. 1980), affg. 66 T.C. 1024 (1976). As the Court of Appeals for the Seventh Circuit recently remarked:

The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. * * * [*Saviano v. Commissioner*, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983).]

Neither the Commissioner nor this Court is bound to accept an allocation of a lump-sum purchase price made under a contract of sale. Generally, a contractual allocation will be upheld if it has "some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." *Schulz v. Commissioner*, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). An allocation by the buyer and the seller will be ignored if it is unrealistic (*Rodman v. Commissioner*, 542 F.2d 845, 851 (2d Cir. 1976), affg. on this issue a Memorandum Opinion of this Court; *F. & D. Rentals, Inc. v. Commissioner*, 365 F.2d 34, 40 (7th Cir. 1966), affg. 44 T.C. 335 (1965)) or is not a result of arm's-length negotiations between parties with adverse tax motivations (*Schulz v.*

*Commissioner, supra* at 55; *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 447 (1980)).

The petitioner claims that there were vigorous and protracted negotiations between Woodscape and Jagger before reaching agreement concerning the terms of the P & C and L & M agreements. However, Jagger and its affiliates were in the business of constructing apartment projects and furnishing related services; consequently, they had no economic reason for being concerned as to how the total payments under the contracts were allocated—all payments were ordinary income for Jagger and its affiliates. Under these circumstances, we conclude that Woodscape and Jagger did not have antithetical interests, and we must decide what amounts, if any, are allocable to interest without regard to the "strong proof" rule. See *Schmitz v. Commissioner*, 51 T.C. 306, 316 (1968), affd. sub nom. *Throndson v. Commissioner*, 457 F.2d 1022 (9th Cir. 1972).

Section 163 allows as a deduction "all interest paid or accrued in the taxable year on indebtedness." Deductible interest is a payment for the use or forbearance of money. *Deputy v. duPont*, 308 U.S. 488, 497 (1940); *Smith v. Commissioner*, 84 T.C. 889, 897 (1985). It is well settled that the "indebtedness" referred to in section 163(a) must be genuine, and economic realities govern over the form in which a transaction is cast. *Knetsch v. United States*, 364 U.S. 361 (1960); *Fox v. Commissioner, supra.* An indebtedness is an existing, unconditional, and legally enforceable obligation for the payment of a principal sum. *Estate of Franklin v. Commissioner*, 64 T.C 752, 761 (1975), affd. 544 F.2d 1045 (9th Cir. 1976); *Howlett v. Commissioner*, 56 T.C. 951, 960 (1971).

Obviously, there are various ways by which Woodscape and Jagger could have arranged for the construction of the Woodscape project, and it is not our purpose to say what method they should have chosen. Yet, to decide the economic reality of the method chosen by them, we must examine some of the alternatives. Woodscape and Jagger could have entered into a contract whereby Jagger agreed to construct the project and to perform the related services for a stated contract price to be paid on the completion of the contract. They might have also provided for the

payment of some interim installments to furnish Jagger with cash during the construction work. Had they chosen either of those methods, Woodscape would not have been obligated to pay any interest to Jagger. The petitioner argues that the chosen arrangement represented a pre-sale; that is, at the time of the closing, there was a sale of the property by Jagger to Woodscape. If the purchase price had been paid at the time of the closing, rather than at the time of completion, we would expect that the price would have been smaller, because Jagger would have received the cash earlier. However, in that event, Woodscape also would not have been obligated to pay interest. Moreover, although the petitioner calls the arrangement a pre-sale, the bulk of the purchase price was not paid at the closing, and Jagger did not secure the benefit of having that amount of cash available for construction. Another alternative would have involved Woodscape's securing the construction financing and paying interest thereon: In that event, Woodscape would have been required to pay the interest on the construction financing and would have been entitled to deduct such interest.[8] However, Woodscape did not incur the indebtedness for the construction financing.

Furthermore, the amounts allocated to interest by Woodscape appear to be excessive. Woodscape calculated the allocated interest by applying the 12-percent-per-annum rate to the total purchase prices for the two phases of the project less the downpayments—$5,400,000 ($5,775,000 less $375,000) and $1,500,000 ($1,690,000 less $190,000), or $6,900,000. As a result, it allocated a total of $1,279,000 ($1,013,000 and $266,000) to interest; thus, if cash had been paid at closing for the two phases of the project, the total prices for phases I and II would have been $4,762,000 ($5,775,000 less $1,013,000) and $1,424,000 ($1,690,000 less $266,000) or a grand total of $6,186,000. Of that price, Woodscape paid downpayments totaling $565,000 ($375,000 and $190,000). Had Woodscape borrowed, at 12 percent, the funds needed to pay the total cash price at the closing less the downpayments, the interest would have been $962,420

---

[8] Sec. 189, which provides for the capitalization of construction period interest and taxes, is applicable to residential real estate only for such interest or taxes paid or accrued after Dec. 31, 1977, and thus has no application to this case.

($789,660 and $172,760), or $316,580 less than the amount allocated by Woodscape to interest.[9] In making these calculations, we have disregarded the installment payments; if they were taken into consideration, the savings would have been even greater. If we compare the interest allocated by Woodscape with the cash prices it would have been required to pay for the two phases of the project at closing, we see that the effective interest rate being paid by Woodscape is 14.18 percent on phase I and 16.01 percent on phase II.

An analysis of the costs and value of the Woodscape project casts further doubt on Woodscape's allocation to interest. On its 1977 partnership return, Woodscape claimed a total basis on phases I and II as of December 31, 1977, of $5,670,000 ($4,633,600 for the capital improvements and $1,036,400 for the land). In the P & C agreements, the purchase prices were allocated in a similar manner: $3,582,600 for the capital improvements in phase I, $966,000 for the capital improvements in phase II. The parties have stipulated that their basis in the land is $771,587 for phase I and $285,000 for phase II, or a grand total for the land and improvements of $5,605,187. However, in its records, Jagger computed the total costs of the Woodscape project to be $6,890,851 ($5,281,510 for phase I and $1,609,341 for phase II). If we allow a reasonable amount for profit, the value of the Woodscape project approximated the total purchase price, $7,465,000. The records of Travelers also support that valuation. In connection with the applications for the permanent financing, Travelers had in its files two cost estimates which stated that the estimated costs of the two projects including overhead and profit were $5,876,000 for phase I and $1,785,000 for phase II, or a total of $7,661,000. We infer that Travelers secured that information from Jagger. For purposes of making its loans, Travelers valued the total project at $7,579,000.

The costs used by Woodscape and reflected in the P & C agreements would indicate that Jagger constructed the

---

[9] These amounts are computed by using an 18-month term for phase I and a 14-month term for phase II as follows: $4,762,000 less $375,000 downpayment = $4,387,000 x 1% per month x 18 months = $789,660; $1,424,000 less $190,000 downpayment = $1,234,000 x 1% per month x 14 months = $172,760.

project at a loss. We have no reason to believe that Jagger would undertake such project without anticipating a profit on its construction activities. Regardless of how Woodscape may have viewed the payments, it is clear that Jagger took the entire purchase prices into consideration in concluding that the project was profitable for it. There is convincing evidence that the Woodscape project was actually worth approximately the amounts of the total purchase prices set forth in the P & C agreements, and that no portion of such prices is properly allocable to interest.

Mr. Schneider testified that Woodscape negotiated the wraparound loans in order to pay Jagger as specified levels of construction and leaseup were achieved. However, since the majority of each of Woodscape's interim payments was designated as interest due and owing on the money which Jagger purportedly loaned to Woodscape on the dates of closing of the P & C agreements, the facts do not support the explanation that it was necessary to tie such payments to various stages of project completion. In addition, Mr. Schneider admitted that Jagger did not insist on full prepayment and execution of the wraparound loans as a condition to commencing construction of phases I and II. Moreover, Mr. Buzbee testified that the wraparound loans were requested by Woodscape, not Jagger.

Although a taxpayer is not denied the benefit of a tax deduction merely because he made a bad bargain or did not structure a transaction in the most cost-efficient manner, the sophistication and experience of Woodscape's general partners and their seeming obliviousness to both the excessive rates of interest set forth in the P & C agreements and more conventional methods of financing which would have saved substantial amounts of money leads us to conclude that the allocations to interest were not simply a bad bargain. The managing general partners of Woodscape were knowledgeable, experienced businessmen. We are unwilling to believe that Woodscape unwittingly contracted to pay an excessive amount of interest to Jagger because of financial naivete. Because of the petitioner's failure to advance any other reasonable explanation, we conclude that Woodscape's nonrecourse wraparound notes were contrived solely to produce the large interest deductions claimed by it

and served no other independent business purpose. Clearly, the claimed interest was excessive. Moreover, since there are methods in which the transactions could have been arranged in which Woodscape would have been required to pay no interest, we are unable to conclude that any amount is properly allocable to interest. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930); *Epp v. Commissioner*, 78 T.C. 801, 807 (1982). We must conclude that the entire $778,000 claimed as interest in 1977 was "merely dressed up to look like 'interest.' " *Titcher v. Commissioner*, 57 T.C. 315, 322 (1971). As such, it must be capitalized rather than deducted currently. Secs. 263, 709; *Commissioner v. Idaho Power Co.*, 418 U.S. 1 (1974); *Johnsen v. Commissioner*, 83 T.C. 103, 126-127 (1984).

The final issue for decision concerns certain other deductions claimed by Woodscape on its 1977 return. The Commissioner argues that these claimed expenses are actually capital expenditures or, in the alternative, are not ordinary and necessary business expenses deductible under section 162. Again, the petitioner bears the burden of proving error in the Commissioner's determination. Rule 142(a); *Welch v. Helvering, supra.*

The P & C agreements provide that the total purchase prices for phases I and II of the Woodscape project include fees of $285,000 to Jagger and its affiliates for the covenants not to compete, leasing and advertising, decorating and furniture handling, commitment to fund cost overruns, and commitment to fund net operating losses. For 1977, Woodscape deducted $180,820 as payments for such fees and for the incentive management fee payable under the L & M agreements.

First, it is clear that some portion of the payments under the P & C agreements was for organization and syndication services. The P & C agreements provided that Jagger would pay S & S, a registered broker dealer corporation owned by the managing general partners of Woodscape, $271,000 for "structuring and arranging the sale herein contemplated." In his testimony, Mr. Schneider admitted that such payments were for the organization of Woodscape and the selling of the interests therein. He claimed that part of the payments were for legal services, but his testimony in that

respect was too vague and general to be convincing. The P & C agreements also provided that at the time Jagger received installment payments under those agreements, it was required to make payments to S & S. On its return, Woodscape treated no part of its payments to Jagger or its affiliates as payments for organization and syndication services; but it is clear that in effect Woodscape was making payments to Jagger, and in turn, Jagger made the payments to S & S for its services in organizing and syndicating Woodscape. Had Woodscape paid for the syndication services itself, such payment clearly would not be deductible (sec. 709; *Johnsen v. Commissioner, supra*), and any payment by Woodscape for organizational expenses must be capitalized and, if elected, amortized in accordance with section 709.[10] Since no such election has been made, none of the payment is amortizable. Thus, we conclude that some part of the payments to Jagger must be allocated to the payments for the organization and syndication services and that such part of such payments is not deductible nor amortizable.

We have already concluded that we are not bound by the allocations of interest in the P & C agreements because those allocations do not reflect arm's-length negotiation and are not in accordance with economic reality. The attempt to disguise the payment of syndication fees casts further doubt on the allocations set forth in the P & C agreements. On such record, we are wholly unwilling to accept the

---

[10] Sec. 709 provides:

SEC. 709(a). GENERAL RULE.—Except as provided in subsection (b), no deduction shall be allowed under this chapter to the partnership or to any partner for any amounts paid or incurred to organize a partnership or to promote the sale of (or to sell) an interest in such partnership.

(b) AMORTIZATION OF ORGANIZATION FEES.—

(1) DEDUCTION.—Amounts paid or incurred to organize a partnership may, at the election of the partnership (made in accordance with regulations prescribed by the Secretary), be treated as deferred expenses. Such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months as may be selected by the partnership (beginning with the month in which the partnership begins business), or if the partnership is liquidated before the end of such 60-month period, such deferred expenses (to the extent not deducted under this section) may be deducted to the extent provided in section 165.

(2) ORGANIZATIONAL EXPENSES DEFINED.—The organizational expenses to which paragraph (1) applies, are expenditures which—

(A) are incident to the creation of the partnership;

(B) are chargeable to capital account; and

(C) are of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life.

allocations made by Woodscape for the services, commitments, and guarantees furnished by Jagger and its affiliates. However, we are satisfied that Jagger performed the services, commitments, and guarantees called for by the P & C agreements, and we are convinced that some portion of the payments under the P & C agreements is properly allocable to such purposes and deductible under section 162 as ordinary and necessary expenses of the partnership. Under such circumstances, we conclude and hold that the partnership is entitled to deduct $50,000 of the fees allegedly paid to Jagger for the covenants not to compete, leasing and advertising, decorating and furniture handling, commitment to fund cost overruns, commitment to fund net operating losses, and the incentive management fee. *Cohan v. Commissioner, supra.* The disallowed deductions may be added to basis and capitalized, except that the payments to cover the organizational and syndication expenses can be neither deducted nor amortized.

*Decision will be entered under Rule 155.*