DAVID E. NICHOLS AND TERESA L. DEESE, FORMERLY TERESA L. NICHOLS, NOW TERESA D. FRITCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nichols v. Commissioner
Docket No. 21922-88
United States Tax Court
T.C. Memo 1990-546; 1990 Tax Ct. Memo LEXIS 600; 60 T.C.M. (CCH) 1039; T.C.M. (RIA) 90546; October 22, 1990, Filed *600 Decision will be entered for the respondent. K. Patrick Neill, for the petitioners. Karen E. Stratton and Ralph W. Jones, for the respondent. GERBER, Judge. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined Federal income tax deficiencies for 1983 and 1984 in the amounts of $ 11,586.20 and $ 15,428.00, respectively. The deficiencies were solely attributable to the disallowance of petitioners' claimed losses from an automobile racing activity. The issue presented for our consideration is whether the automobile racing activity constituted an activity not engaged in for profit *602 within the meaning of section 183. [1]
FINDINGS OF FACT The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners were husband and wife during 1983 and they filed a joint 1983 income tax return with the Internal Revenue Service in Ogden, Utah. Petitioners were not married during all pertinent times with respect to 1984, and petitioner David E. Nichols filed an individual 1984 income tax return with the Internal Revenue Service in Ogden, Utah. At the time their petition in the present case was filed, petitioner David E. Nichols [2] resided in Eugene, Oregon, and petitioner Teresa D. Fritch resided in Charlotte, North Carolina. Petitioner was employed full-time as an anesthesiologist during 1983 and 1984. His income for 1983 and 1984 was $ 144,133 and $ 167,530, respectively. *603 Petitioner had been interested in automobile racing since 1960, during high school. During petitioner's medical residency training in Seattle, from 1971 through 1973, he became involved in amateur automobile racing and gained experience by serving as a crew member for others. When petitioner moved to Eugene, Oregon, in 1975, he bought a late model Corvette, primarily to drive as a street car. Petitioner decided to try amateur autocross racing where cars are driven around pylons in a parking lot one car at a time. Petitioner made several modifications to his Corvette to increase its performance and handling in this type of competition. Around 1978, petitioner purchased a car specifically to have it rebuilt as a dual-purpose car that could be used for sports car road racing and autocrossing. Pat Usher (Usher), owner of Sunset Engine Development in Beaverton, Oregon, began working on petitioner's car. Usher built *604 race car engines and built, modified, and set up chassis. He also had developed and marketed various products relating to the racing business. While petitioner engaged in the automobile racing activity, Usher did all of the mechanical and chassis development on petitioner's car, but did not work on the body of the car. Bodywork was usually done by Scott Raney (Raney) and Kelly Cochran (Cochran), members of petitioner's racing team. Around 1979, petitioner decided to develop the car strictly for sports car racing. While petitioner was having this car built, he attended a drivers' school in Portland and raced in the three required novice races in order to obtain his novice competition license. In the three required novice races, petitioner placed first in two and second in the other. Subsequent to obtaining his license, petitioner occasionally instructed at these drivers' schools. Petitioner competed in amateur automobile racing in several classes of competition until he decided to race at the professional level of competition in 1979. Amateur racing and professional racing each have their own rules and specifications. Professional racing requires greater investments of time *605 and money than amateur racing. Petitioner believed that he could race the car with some additional modifications and win money, as opposed to a trophy, for doing well in the race. Petitioner consulted with Usher as to the potential profitability of auto racing and relied on his advice regarding the profitability of the activity. Usher was optimistic that the activity would be financially successful and encouraged petitioner to advance to the professional level. Usher agreed to participate as part of the team. Prior to becoming a professional race car driver, petitioner did not estimate how long it would take to recoup his investment from his automobile racing activity. During 1979, petitioner obtained the licensing required to race at the professional level. Petitioner operated his racing activities under the assumed business name "Revolution Racing," maintained a separate bank account, kept accounting records of expenditures for his racing activities, and obtained an employer identification number. Petitioner planned to race in the Sports Car Club of America (SCCA) Trans-Am Series or the International Motor Sports Association (IMSA) GTO class. There were 17 races in the IMSA *606 circuit held during 1984. If a racer placed first in each of these races, he would have won the total maximum potential prize monies of $ 135,750. If a racer consistently finished second in each of the 17 races, he would have won $ 74,250. If a racer consistently placed third in each of the 17 races, he would have won $ 45,075. The total potential prize money was comparable for 1983. Petitioner's racing team included Usher, Cochran, and Raney. Usher volunteered much of his services, and the other team members generally did not receive a salary. Cochran, Usher, and Raney were also personal friends of petitioner. Between 1979 and 1982, petitioner earned approximately $ 5,700 from professional race car driving. Petitioner's total racing income during 1979 through 1982 was $ 5,995. However, some of the prize money was earned from semi-professional car racing. Petitioner did not win any prize money during 1983 and 1984. Throughout petitioner's professional racing career, his race car experienced several mechanical failures. In many races where the car suffered a mechanical failure, it could not continue to compete because petitioner did not have extra engines and backup parts. *607 It was common practice among professional racers to keep extra engines and backup parts. During November 1979, petitioner entered his first professional race, the Daytona IMSA Finale, and the engine failed after approximately 12-15 practice laps, precluding petitioner's competition. During April 1980, petitioner entered a race at Monterey, California, but was unable to compete, because Raney did not finish bodywork until July 4, 1980. After the bodywork was finished, the race car was taken to Seattle for testing. Subsequent to this testing, the crankshaft bearings failed. The car had been entered in the August 1980 Portland Enduro IMSA race but was unable to race because of the broken crankshaft. During the winter of 1980 and into early 1981, petitioner and his team were constructing a new body to make it lighter. They were also making mechanical improvements to the car, motor, and chassis. Hence, the car did not compete in any races during that period. The race car was taken to the July 1982 IMSA race in Sears Point, California. In that race, petitioner paid Usher to drive the car because he was considered to be the "quicker" racer. The car did not finish the race because *608 the motor exploded. During 1982, petitioner had the motor completely rebuilt and took the car to the GI Joe's Grand Prix - IMSA GT race in Portland. Again, petitioner paid Usher to drive in this race. The car finished second and won $ 5,300, which was income to petitioner. In late 1982, the race car was involved in a crash which disabled the vehicle and necessitated a complete rebuilding. During 1983, petitioner, Cochran, and Raney decided to build a state-of-the-art, high tech, strong body for petitioner's race car. Raney was involved in an automobile accident which left him a quadriplegic. Thus, he was unable to provide much assistance but served as an advisor. Petitioner and Cochran spent a significant amount of time on the building of the new car. The car was not entered in any races during 1983. Petitioner continued development of the car during the first half of 1984. The car was taken to the August 1984 IMSA GT race at Sears Point, California, where valve problems were experienced during qualification, preventing petitioner from racing. Petitioner did not enter any other races during 1984. For 1983 and 1984, petitioner reported no income from the racing activity. *609 For 1983 he claimed a $ 21,104 loss from the racing activity, $ 17,949 of which was attributable to depreciation of his racing automobile. For 1984 he claimed a $ 29,585 loss, $ 20,164 of which was attributable to depreciation. Repair expenses for the automobile during 1983 and 1984 were $ 1,069 and $ 3,804, respectively. Accordingly, a substantial amount of petitioner's loss was from depreciation of the automobile, which was not raced during 1983 and 1984. To be exact, the depreciation represented 85 percent and 68 percent of the claimed loss for 1983 and 1984, respectively. The repair expenses, on the other hand, represented 5 percent and 13 percent of the loss. From 1979 through 1984, petitioner did not aggressively attempt to obtain a sponsor to bear the costs of his racing activity even though he recognized that his financial success was dependent on securing sponsorship. During 1980, petitioner hired Steve Castanzo (Castanzo) of Sponsors Plus to obtain sponsorship for the racing activity. Petitioner paid $ 2,500 to Castanzo to obtain sponsorship for Revolution Racing. Castanzo did not obtain any results, and petitioner became disillusioned with him around 1981. During *610 1983, the owner of a photography business paid petitioner $ 1,000 to put his name on the car for the Sears Point race. However, petitioner had to return the money to the owner because the car did not compete in that race. During 1984, petitioner was approached by Jonathan Hart regarding the leasing of his car to others. Hart was not successful in finding any racers to lease petitioner's car. During 1983 and 1984, the racing automobile was not rented to any other party. In late 1984, Alice Ray-Keil (Keil), the sister of one of petitioner's crew members, was hired to pursue sponsorships. Keil had no experience in obtaining sponsorship for professional automobile race cars but received national recognition from her experience in obtaining money from major corporations to benefit homeless children. Keil did not obtain any sponsorship for petitioner. During 1983 and 1984, the only sponsorship that petitioner received was in-kind sponsorship, such as spark plugs, oil, and gear lubes. During the years 1979 through 1985, petitioner spent at least 20 hours per week engaged in some aspect of his racing activity. Petitioner's wife did not share his interest in automobile racing. Petitioner *611 believes that his devotion of large amounts of time, energy, and money to his automobile racing activity were big factors that led to his divorce from his wife. During 1985, petitioner returned to amateur racing where he had a high level of success. Petitioner returned to professional racing during 1987 to race in a new professional racing series that the SCCA developed specifically for showroom stock cars, the kind of car petitioner was racing as an amateur. Petitioner had greater success in attracting sponsorships than he had during his previous racing career. Chevrolet Motor Division of General Motors provided support in the form of a motor, an exhaust system, spare transmissions, and spare differentials. Chevrolet Motor Division provided support because they wanted to see their Corvettes do well in the races. Petitioner also received support in the form of consumables from Red Line Oil Products, Yokohama Tires, General Tire MotorSports, Tokico Shocks, Monroe Shocks, and Worn Winch. OPINION We must decide the factual issue of whether petitioner's automobile racing activity was not engaged in for profit. Section 183(a) provides that if an activity engaged in by an individual *612 is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183. [3] Section 183(b)(1) allows deductions related to the activity which are allowable regardless of whether the activity is engaged in for profit. Section 183(b)(2) allows for deductions to the extent that the gross income derived from the activity exceeds the deductions which are allowable irrespective of an objective to realize a profit. An activity not engaged in for profit is defined in section 183(c) as an activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. *613 In determining whether an activity is engaged in for profit a reasonable expectation of profit is not required, as long as the relevant facts and circumstances establish that the taxpayer entered into or continued the activity with an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). "Profit" means economic profit, independent of tax savings. Landry v. Commissioner, 86 T.C. 1284, 1303 (1986); Beck v. Commissioner, 85 T.C. 557, 570 (1985); Herrick v. Commissioner, 85 T.C. 237, 254 (1985). In making this determination, more weight is accorded to objective facts than to the taxpayer's statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Siegel v. Commissioner, 78 T.C. 659, 699 (1982). Petitioner bears the burden of proving that he possessed the required profit objective. Rule 142(a); *614 Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Section 1.183-2(b), Income Tax Regs., sets forth nine criteria to be considered in determining whether an activity is one engaged in for profit. The factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. No single factor is controlling. Golanty v. Commissioner, supra at 426; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Petitioner argues that all the facts and circumstances of this *615 case, when evaluated objectively, support the conclusion that he honestly held the necessary profit objective with respect to his automobile racing activity. Conversely, respondent asserts that the facts in this case do not support petitioner's contention that his objective was to make a profit. We agree with respondent. We discuss the relevant factors and their application to this case. 1. The Manner In Which Petitioner Carried On The Activity
There are certain factors reflecting that petitioner carried on his racing activity in a businesslike manner. Petitioner operated the racing activity under the assumed name (Revolution Racing). Petitioner maintained a separate bank account and kept accounting records for his racing car activity. Petitioner obtained an employer identification number. However, a larger body of evidence shows that the activity was not carried on in a businesslike manner. During the years 1979 through 1984 petitioner had a consistent history of losses from his automobile racing activity and did not take any meaningful action to improve the profitability of the automobile racing activity. Petitioner did not compete in enough races to enable *616 him to potentially make a profit. Petitioner's car repeatedly suffered mechanical failures which precluded him from competing in several races. Petitioner earned sufficient income from his medical practice to enable him to have extra engines and backup parts available at his races. Petitioner's efforts to secure sponsorship were sporadic and unsuccessful. During 1980, petitioner hired Steve Castanzo to obtain sponsorship for Revolution Racing. However, petitioner did not initiate contact with anyone else regarding sponsorship until 1984, when petitioner hired Keil, the sister of one of his crew members, to pursue sponsorship. Although she received national recognition from her efforts in obtaining money from major corporations to benefit homeless children, she had no experience in obtaining sponsorship for professional automobile race cars. 2. The Expertise Of The Taxpayers Or His Advisors
Petitioner had expertise and experience in racing with a focus on amateur racing. Petitioner attended and instructed at driving schools. In addition, petitioner consulted with Usher who was an expert on engineering, design, and construction of racing cars. Petitioner also consulted *617 with Cochran and Raney, who were experts in car body development. However, the absence of adequate preparation and investigation are indications of petitioner's lack of a profit objective. Sec. 1.183-2(b)(2), Income Tax Regs. Petitioner did not have expertise in the underlying economics of automobile racing. Petitioner consulted with Usher to determine the potential profitability of his race car activity. However, Usher had no experience in making a profit from professional automobile racing and had never raced professionally. There is nothing in the record which establishes that petitioner studied business and economic practices or consulted with an accountant to financially advise him about the automobile racing activity prior to engaging in the activity. Additionally, he did not analyze the overall cost or necessary capital investment relative to potential revenue. 3. The Time And Effort Expended By The Taxpayer In Carrying On The Activity
The time and effort devoted by petitioner in carrying on the automobile racing activity was substantial. Petitioner devoted a significant portion of the time he was not working as an anesthesiologist *618 to his racing car activity, most of which involved the preparation, planning, and business phases of that activity. Such devotion by a taxpayer of personal time and effort to carrying on an activity is one factor to be considered in determining whether a taxpayer had a profit objective. Sec. 1.183-2(b)(3), Income Tax Regs. However, petitioner also derived great pleasure from automobile racing. This mitigates against a finding that the activity was engaged in for profit. Whitener v. Commissioner, T.C. Memo. 1979-415. 4. The Success Of The Taxpayer In Carrying On Similar Or Dissimilar Activities
The record shows that petitioner had some success in a similar activity. Petitioner spent many years as an amateur race car driver. He attended drivers' school, raced in the requisite three novice races, and obtained his novice competition license. Petitioner placed first in two of the required novice races and second in the other required race. The record also shows that petitioner was relatively successful at a dissimilar activity, his medical practice. His income for 1983 and 1984 was $ 144,133 and $ 167,530, respectively. Petitioner's *619 relative success in his medical practice shows that he possessed the business acumen necessary to make a business venture successful. 5. The Taxpayer's History Of Income Or Losses And Amount Of Occasional Profits, If Any, Which Are Earned With Respect To The Activity
The continued operation of an unprofitable activity past a reasonable start-up phase is an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, a history of losses is not necessarily determinative of a lack of a bona fide profit objective. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Allen v. Commissioner, 72 T.C. 28, 34-35 (1979). A series of losses beyond the start-up stage may not be inconsistent with a bona fide profit objective if such losses can be explained as the result of unforeseen circumstances beyond the taxpayer's control. Sec. 1.183-2(b)(6), Income Tax Regs.
During the years 1979 through 1984, petitioner was involved in the automobile racing activity. Petitioner had a consistent history of losses from his automobile racing activity and did not make *620 a profit in any tax year. The amount of profits in relation to the amount of losses incurred is an important factor in determining whether a taxpayer had the requisite profit objective. Sec. 1.183-2(b)(7), Income Tax Regs.
Petitioner conceded that the two primary sources of income in professional racing were sponsorships and race purses. The racing circuit for which he was preparing offered total maximum potential prize monies in 1984 of $ 135,750 and a comparable prize potential in 1983. We note that although there were large amounts of prize money to be won in the racing circuit for which petitioner was preparing, petitioner only participated in one such race during 1983 and 1984. Even if petitioner had entered all races during 1983 and 1984, there is no indication that he would have been a competitive racer. During the years 1979 through 1984, the only meaningful prize money was won when Usher was the driver. In addition, petitioner did not have the sponsorship which is apparently needed to assist in making automobile racing profitable. During 1983 and 1984, petitioner received only $ 1,000 in sponsorship and had to return the money for failure *621 to compete in the sponsored race. Petitioner argues that he was subsequently successful in obtaining sponsorship, which indicates that he engaged in the automobile racing activity for profit. When petitioner returned to professional racing in 1987, he raced in a series that did not exist during 1979 through 1984. During petitioner's earlier professional career, he attempted to build a state-of-the-art racing car. He was not successful in this endeavor, and the car continued to suffer mechanical failures. When petitioner returned to professional racing in 1987, he drove the same kind of car as he did when he was an amateur. This car did not require substantial modification for performance. Although petitioner was successful at attracting sponsors when he returned to professional racing, he drove a different race car in a different racing series. We do not believe that petitioner's success in attracting sponsorship in the subsequent years supports his argument that he engaged in the automobile racing activity for profit during 1983 and 1984. 6. The Financial Status Of The Taxpayer
Substantial income from sources other than the activity may indicate that the activity *622 is not engaged in for profit, especially if there are personal or recreational elements involved. Sec. 1.183-2(b)(8), Income Tax Regs. Petitioner's income from his medical practice for 1983 and 1984 was $ 144,133 and $ 167,530, respectively. Petitioner deducted losses on his return from the automobile racing activity in the amounts of $ 21,104 and $ 29,585, respectively. A large percentage of the losses was attributable to depreciation of his automobile. A small percentage was attributable to repairs or improvements. The deduction of the losses from the automobile racing activity served to offset petitioner's substantial salary income. 7. The Presence Of Elements Of Personal Pleasure Or Recreation
Petitioner had derived personal pleasure from automobile racing since his high school days. Petitioner devoted a substantial portion of the time he was not working as an anesthesiologist to his racing activity. Most of this time involved the preparation, planning, and business phases of that activity as opposed to the actual racing of the car. The percentage of time petitioner spent on the actual racing of the car was dramatically reduced and *623 the time he spent on car development and business aspects of the activity increased after he decided to race in the professional series. In addition, on at least two occasions, petitioner delegated driving the car to Usher, who was considered the quicker driver. We do not believe that business and pleasure are mutually exclusive. Barton v. Commissioner, T.C. Memo. 1980-179; McDonnell v. Commissioner, T.C. Memo. 1967-18. But the fact that an activity has recreational aspects is relevant in determining whether an activity is engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs. Although there were business aspects of the automobile racing activity, we believe that the activity was petitioner's form of recreation which brought him great pleasure. Petitioner did spend a substantial amount of time on the car development along with his racing team. However, his team was comprised of his personal friends, and he testified that he enjoyed spending time with them. On the basis of the entire record and the foregoing analysis, we conclude that petitioner's automobile racing activity was an activity not engaged in for profit. *624 Consequently, we hold that petitioner's expenses from his automobile racing activities are deductible only to the extent of his income from those activities. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. References to petitioner in the singular are references to David E. Nichols individually.↩
3. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩