GERALD G. JOHNSON AND MARION M. JOHNSON, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johnson
Docket No. 3904-90
United States Tax Court
T.C. Memo 1992-358; 1992 Tax Ct. Memo LEXIS 377; 63 T.C.M. (CCH) 3174; June 23, 1992, Filed *377 Decision will be entered for respondent. Robert S. Wrinkle, for petitioners. Guy R. Glaser and Catherine L. Lau, for respondent. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1983
$ 11,822
$ 591.10
[1]
$ 2,955.50
1984
9,229
461.45
[1]
2,307.25
1985
8,543
427.15
[1]
2,135.75
After concessions by the parties, the issues are: (1) Whether petitioners' yacht-chartering activity was an "activity not engaged in for profit" within the meaning of section 183(a). We hold that the activity was not engaged in with the requisite profit objective. Petitioners, therefore, are not entitled to deduct expenses relating to the activity under sections 162 or 212 and are not entitled to an investment tax credit under sections 38 and 46. (2) Whether petitioners are liable for additions to taxes under section 6653(a)(1) and (2). We hold that they are. (3) Whether petitioners are liable for additions to tax under *378 section 6661 for the years at issue. We hold that they are. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners are husband and wife and resided in San Jose, California, at the time they filed their petition. References to petitioner in the singular are to Gerald G. Johnson. Petitioner was a mechanical engineer, and Marion M. Johnson was an attorney during the years at issue. Petitioner holds a degree in mechanical engineering from the University of California at Berkeley. Petitioner was employed full time as an engineering manager of a technical services group engaged in architectural design work for power plants. Sailing was a hobby of petitioner, who purchased his first boat, a 1921 21-foot wooden-hulled sailboat, in 1951 or 1952. During the sixties, petitioners chartered boats for 1 - or 2-week periods out of Seattle, Anacortes, and Bellingham, Washington. In 1980, after a sailing trip in the Caribbean, petitioners became interested in purchasing a sailing *379 yacht. In early 1982, after visiting several of the area's sailing clubs, petitioners joined the Olympic Circle Sailing Club (OCSC) in Berkeley, California. OCSC was primarily a sailing school. It also was a yacht-chartering operation that offered its approximately 200 members a variety of social events to encourage chartering by members. OCSC chartered sailboats to the general public and OCSC members, with approximately 80 to 85 percent of all of OCSC's charters going to OCSC members. OCSC members received a 25-percent discount off the regular charter rates on charters of members' sailboats. Approximately 75 percent of general public charters were for sailing students. Individuals wishing to charter OCSC sailboats were required to complete a written test covering the range of sailing and safety knowledge and a "practical" 2-hour test using a member's boat, and leave a deposit. Members whose sailboats were used for these "practical tests" would not receive any chartering revenue for such tests, which comprised about 5 percent of all OCSC charters. OCSC maintained records of all charter activity at the Club which are available to prospective members, but petitioners never *380 inspected such records. At the time petitioners joined OCSC, petitioner was not committed to the idea of purchasing a sailboat and offering it for charter at OCSC. After becoming a member of OCSC, petitioner participated in OCSC's sailing classes and chartered boats, and became certified to sail boats up to 40 feet. During 1982 and 1983, petitioner was able to obtain a general understanding of OCSC and OCSC's operations. Sometime in 1983, petitioner decided to purchase a sailing yacht and make it available for charter at OCSC. Petitioner consulted with Anthony Sandberg, the founder and president of OCSC, who suggested a sailing vessel in the 32 - to 36-foot range, particularly those made by C & C or Pearson, of which OCSC already had many under charter agreement. On August 7, 1983, petitioners executed an agreement with Nor Cal Yachts (Nor Cal) to purchase a 1983 C & C 32-foot fiberglass sailing yacht for $ 73,000. Petitioners negotiated the type of equipment to be sold with the yacht, as well as the price of the yacht with Nor Cal. Prior to executing the sales agreement, petitioners were provided with a "Charter Program Worksheet" by Nor Cal containing the *381 following information: Assumptions
Cost
: $ 80,750.00
Loan Term
: 180 months
Loan Rate
: 10.5% V.I.R. (Variable Interest Rate)
Monthly Mortgage Payment
: $ 750.00
Tax Bracket
: 50%
Charter Days
: 75 days
$ Per Charter Day
: 140
Charter Commission
: 50%
# Months in 1983
: 4 months
Years
DESCRIPTION
1983
1984
1985
Income
Charter Income
$   3,500.00 $  10,500.00  $  10,500.00   Operating Expenses
Charter Commission
$   1,750.00 $   5,250.00  $   5,250.00   Insurance
375.55 1,126.65  1,126.65   Maintenance
322.31 966.94  966.94   Dock Rent
588.80 1,766.40  1,766.40   Total Operating
Expenses
$   3,036.66 n1 $   9,109.98  [1] $   9,109.98 Total Operating
Profit /<Loss>
$      463.34 n1 $   1,390.02  n1 $   1,390.02 Other Expenses
Depreciation
$  11,482.37 $  16,840.80  $  16,075.31   Interest Expense
2,394.49 7,043.80  6,816.48   Property/Use Tax
966.94 966.94  966.94   Total Other Expenses
$   14,843.80 $  24,851.54  $  23,858.73   Total Taxable
Gain/<Loss>
$ <14,380.46>
$ <23,461.53> $ <22,468.72>  Total Tax Benefit
$   7,190.23 $  11,730.26  $  11,234.36    *382 Years
DESCRIPTION
1986
1987
Total
Income
Charter Income
$  10,500.00   $  10,500.00   $  45,500.00 Operating Expenses
Charter Commission
$   5,250.00   $   5,250.00   $  22,750.00 Insurance
1,126.65   1,126.65   4,882.15 Maintenance
966.94   966.94   4,190.07 Dock Rent
1,766.40   1,766.40   7,654.40 Total Operating
Expenses
$   9,109.98 [1]
$   9,109.98 [1]
$  39,476.62 Total Operating
Profit/<Loss>
$   1,390.02 [1]
$   1,390.02 [1]
$   6,023.38 Other Expenses
Depreciation
$  16,075.31   $  16,075.31   $   76,549.10 Interest Expense
6,564.11   6,283.94   29,102.82 Property/Use Tax
966.94   966.94   4,834.70 Total Other Expenses
$  23,606.36   $  23,326.19   $ 110,486.62 Total Taxable
Gain/<Loss>
$<22,216.35>  $ <21,936.18>  $ <104,463.24>
Total Tax Benefit
$  11,108.17   $  10,968.09   $  52,231.11 This worksheet projected estimated charter income, operating *383 expenses, and other expenses for the period from 1983 through 1987. The worksheet made certain assumptions regarding the final cost of the boat, interest rate, and terms of the loan financing the purchase, the tax bracket of the purchaser, annual depreciation deductions, number of days that the boat would be chartered per year, charter fee, and charter commission rate. All of these assumptions turned out to be fairly accurate. Principal payments on the loan financing the purchase were not included in any of the worksheet's calculations. Of the $ 73,000 purchase price, petitioners paid $ 8,000 up front and financed the remaining $ 65,000 over 15 years with a variable rate loan requiring 180 installments commencing at $ 739.09 per month. Petitioners obtained boat insurance for an annual fee of $ 759. Thus, according to the worksheet provided to petitioners by Nor Cal, the final purchase price of the sailboat, and petitioners' financing terms, all of which was known by petitioners prior to the commencement of their charter activity, the anticipated economic results of the charter activity were as follows: Projected annual operating income
$ 10,500.00
Projected annual operating expenses
$ 9,109.98
Projected annual property/use tax
966.94
Projected annual mortgage payments
8,869.08
Economic loss
$ (8,446.00)
*384 On October 1, 1983, under the name "M & J Leasing", petitioner executed a "Yacht Charter Agreement" in his individual capacity. The agreement covered the period October 1, 1983, through December 31, 1986, and required petitioner to make the sailboat available for charter exclusively with OCSC for a fee of 50 percent of charter income. A placement fee of $ 2,190 was paid by petitioners to OCSC on October 1, 1983. The charter fee in effect at OCSC on the date the agreement was executed was $ 145 per day on weekdays and $ 165 per day on weekends. In late 1986, petitioner contracted with OCSC to allow private charters of the sailboat in addition to OCSC charters with a reduced fee being paid to OCSC for such charters. During late 1984 or early 1985, petitioner made his own projection regarding the profitability of the chartering activity. The projection assumed a slightly, but steadily, increasing number of charters per year from 75 in 1984 to 92 in 1990, and increasing charter rates from $ 140 in 1984 to $ 200 in 1990. Petitioner's analysis also showed a corresponding increase in projected profit from $ 1,772 in 1984 to $ 5,525 in 1990. However, petitioner's projection only *385 takes into account OCSC's commission, insurance, dock rent, and maintenance expense. Petitioner excluded interest and principal payments on the acquisition note (or other measure of cost recovery such as depreciation) and property or use tax. Prices of sailboats had been increasing somewhat during the period of the late seventies and early eighties. New sailboats were becoming more expensive and, therefore, were pulling up the value of used sailboats as an alternative to a new vessel. Petitioners anticipated moderate appreciation of the value of their sailboat (the record does not indicate that this was ever reduced to a dollar value), but such appreciation never materialized. During 1982 and 1983, the average number of days that a sailboat of the type, size, and quality of petitioners was chartered at OCSC was 75 to 80 per year. No OCSC sailboats in that size range were chartered for more than 100 days in a year. Since rainy weather generally inhibits sailboat charters, the charter season in the San Francisco Bay area is weather dependent, with March through October usually providing the best sailing opportunities. Petitioners were provided with a monthly accounting of their *386 sailboat's charter income and incidental expenses. Although petitioners did not maintain a separate bank account for the activity, they maintained a set of financial records regarding the operation of their sailboat chartering activity. Petitioners' records accounted for interest and principal payments on the acquisition indebtedness and use taxes, as well as maintenance and other expenses. Both petitioner and OCSC performed maintenance on the sailboat. Petitioners' sailboat was chartered 3 days in 1983, 72 days in 1984, and 52 days in 1985. Petitioners used their sailboat for personal use on 6 days in 1984 and 5 days in 1985. Petitioners never reported any profit for the yacht-chartering activity on their income tax returns for the years at issue. Petitioners claimed an investment tax credit of $ 7,300 for the purchase of their sailboat on their 1983 tax return. Petitioners claimed depreciation expenses of $ 10,950, $ 16,060, and $ 15,330 contributing to reported losses for the chartering activity of $ 16,435, $ 31,252 and $ 23,616 for 1983, 1984, and 1985, respectively. OPINION The first issue for decision is whether petitioner's yacht-chartering activity was an "activity *387 not engaged in for profit" within the meaning of section 183(a). Petitioners assert that the activity was engaged in for profit and, therefore, claimed an investment tax credit for the tax year 1983, as well as operating losses for 1983, 1984, and 1985. Respondent disallowed the credit and losses based on her determination that the activity was an activity not engaged in for profit. Petitioners have the burden of proving that respondent's determination was not correct. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). An"activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Section 162 allows a taxpayer to claim a deduction for ordinary and necessary expenses paid or incurred in the carrying on of a trade or business. Section 212 allows a taxpayer to deduct expenses incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. To deduct expenses under *388 sections 162 or 212, the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit. Beck v. Commissioner, 85 T.C. 557, 569 (1985); sec. 1.183-2(a), Income Tax Regs. Profit in this respect means economic profit independent of tax savings. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Landry v. Commissioner, 86 T.C. 1284 (1986). The existence of the requisite profit objective is a factual question that must be determined upon the entire record. Benz v. Commissioner, 63 T.C. 375, 382 (1974). Although the taxpayer's expectation of profit need not be reasonable, the facts and circumstances must indicate that the taxpayer entered into or continued the activity with the objective of making a profit. Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs.
Petitioners bear the burden of proving that they had the requisite profit objective. Rule 142(a); Welch v. Helvering, supra; *389 Beck v. Commissioner, supra, at 569. This determination is made upon consideration of all the relevant facts and circumstances, with greater weight placed on the objective facts than the taxpayer's mere statement of intent. Golanty v. Commissioner, supra; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs.,provides a nonexclusive list of factors bearing on whether an activity is engaged in for profit. We will review them in return along with the corresponding relevant facts, if any, present in this case. No single factor, nor even the majority of factors, is controlling. Golanty v. Commissioner, supra.
1. Manner in Which the Taxpayer Carries On the Activity
There was no separate bank account to control cash inflows and outflows for the activity. Petitioners kept general financial records in connection with the yacht-chartering activity. We note, however, that these records in connection with the yacht-chartering activity. We note, however, that these records account for the interest and principal payments *390 on the acquisition indebtedness and property or use tax payments that petitioners excluded in the profitability analysis they made regarding the chartering activity. In late 1986, petitioners did obtain the right to attempt to personally charter their sailboat. However, this occurred after they had already claimed tax losses for the activity for 3 years with tax benefits that they had reason to know would result from engaging in the chartering activity. 2. The Expertise of the Taxpayer or His Advisors
Petitioner had previously owned a small sailboat, took sailing classes, and chartered boats, but he had no background in the yacht-chartering business. Petitioner's investigation of chartering business conditions and prospects was cursory. Before purchasing the yacht, petitioner consulted with a few yacht sales agents but relied primarily on the advice of Sandberg, the president of OCSC, and representatives of Nor Cal, the yacht dealer, in choosing a sailboat. Petitioner did not seek any disinterested advice or assistance from knowledgeable third parties regarding the prospects of earning economic profits in a sailboat chartering business. 3. The Time and Effort Expended *391 by the Taxpayer in Carrying On the Activity
While petitioner spent time purchasing the sailboat, he expended no personal efforts to advertise or otherwise promote the charter activity during the years at issue. He left that activity to OCSC which charged a commission equal to 50 percent of the charter gross income. Petitioner split the maintenance duties with OCSC. OCSC charged for whatever maintenance work it did. 4. Expectation That Assets Used in Activity May Appreciate in Value
Petitioners anticipated a modest increase in the value of the sailboat based on the generally rising prices of new sailboats. 5. The Success of the Taxpayer In Carrying On Other Similar or Dissimilar Activities
Petitioners had never engaged in a yacht-chartering business, and there is no indication that they had ever been engaged in any similar activity or dissimilar activity that would aid our analysis of this case. 6. The Taxpayer's History of Income or Losses With Respect to the Activity
Petitioners' yacht-chartering activity never attained profitability. 7. The Amount of Occasional Profits, If Any, Which Are Earned
Petitioners' yacht-chartering activity never *392 earned any profits. 8. The Financial Status of the Taxpayer
Petitioners were both employed professionals with sufficient earned and passive income during the years at issue to take advantage of the investment tax credit and the continuing tax savings resulting from entering into and maintaining an unprofitable yacht-chartering activity. 9. Elements of Personal Pleasure or Recreation
Sailing was a hobby for petitioners, but they used their sailboat only 11 times for personal purposes during the years at issue. Significantly, we note that even assuming a best case scenario of 100 charters of petitioners' sailboat per year at the highest possible charter rate of $ 165, petitioners could not have expected to earn an economic profit when acquisition costs are taken into account: charter revenue
($ 165 x 100 charters)
=
$ 16,500
commission expense
(50 % of charter revenue)
=
$ 8,250
insurance expense [1]
=
710
maintenance expense [1]
=
1,050
dock rental [1]
=
1,750
annual acquisition note payments
($ 739 x 12 months)
8,868
($ 20,628)
($ 4,128)
*393 Petitioners were required to make monthly payments of over $ 700 in interest and principal on the loan that enabled them to acquire the income-producing asset for their chartering activity. Rational, educated persons such as petitioners require an economic return on investment of their assets. Such payments were a real economic cost to petitioners in their chartering activity upon which they would require an economic return. Petitioners ask us to hold that they had the requisite profit objective in engaging in their charter activity without considering this cost or some other cost recovery allowance,such as depreciation. We do not think that an investor with an actual and honest profit objective would analyze the profitability of an investment in such a manner. This cost factor must be taken into account in determining the existence of an actual and honest objective of earning an economic profit. Petitioners factored tax savings into their decision to enter into the chartering activity. The type and magnitude of tax savings they counted on are illustrated in the worksheet provided to them by Nor Cal, the dealer who subsequently sold them the sailboat. Further, as evidenced *394 by the charter program worksheet, petitioners must have realized that operating a chartering activity under the agreement they entered into with OCSC would not yield an economic profit, even assuming a modest increase in the value of their sailboat and assuming that they would be able to charter the boat 75 days each year. An actual and honest profit objective, within the meaning of section 183, means economic profit independent of tax savings. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Landry v. Commissioner, 86 T.C. 1284 (1986). We conclude that tax savings were an integral and necessary part of petitioners' decision to enter into a chartering activity. We are not convinced that the objective facts here show that petitioners had the requisite actual and honest profit objective. Based upon the record herein, we hold that petitioners' yacht-chartering activity was not engaged in for profit within the meaning of section 183. Therefore, petitioners are not entitled to an investment tax credit in 1983 and losses in 1983, 1984, 1985 in connection with the activity. We also must *395 determine whether petitioners are liable for additions to taxes under section 6653(a)(1) and (2). Negligence under section 6653(a) is lack of due care, or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination that petitioners' underpayments of tax were due to negligence or intentional disregard of the rules or regulations is "presumptively correct and must stand unless the taxpayer can establish that he was not negligent." Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337. Petitioners therefore bear the burden of proving that they are not liable for the additions to tax. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). On brief, petitioners present no objective facts indicating, nor do they make any persuasive argument concluding, that they are not negligent and thus not liable for the additions to tax under section 6653(a) beyond their bare statement that this case is a close one where opinions could differ. We disagree. On this record, we *396 hold that petitioners are liable for the additions to tax under section 6653(a). Finally, we also must address whether petitioners are liable for the additions to tax for substantial understatements of tax liability under section 6661. The amount of a section 6661 addition to tax assessed after October 21, 1986, is 25 percent of the amount of any underpayment attributable to such substantial understatement. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498, 500-503 (1988). An understatement is substantial if the understatement exceeds the greater of $ 5,000 or 10 percent of the amount required to be shown on the return. Sec. 6661(b)(1)(A). The understatement, however, is reduced by any portion of the understatement attributable to a return position for which there is substantial authority. Sec. 6661(b)(2)(B)(i). Petitioners argue that substantial authority supports their 1983, 1984, and 1985 return positions. They refer to a number of boat chartering and other cases where a profit objective was determined to exist. For substantial authority to exist, there must be legal authority which supports the taxpayer's application of the law to the facts in *397 their case. See Antonides v. Commissioner, supra at 702. A case cannot be substantial authority, however, if it is materially distinguishable. Petitioners have not shown authority holding that the requisite profit objective existed in even remotely similar facts when the recovery of investment costs was ignored. In this case, such costs are a relevant economic factor in determining profit objective. We consider this fact material. Therefore, we hold that petitioners have not shown that they relied on substantial authority in taking their return positions for the years at issue and are liable for the additions to tax for substantial understatements under section 6661. Decision will be entered for respondent. Footnotes
1. 50 percent of the interest due on the deficiency.↩
1. Minor rounding error in original.↩
1. As estimated by petitioner for 1985.↩