T.C. Memo. 1997-401


UNITED STATES TAX COURT


ROBERT E. AND CAROLYN S. HOLMES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 4870-93, 27120-93.    Filed September 10, 1997.


<u>Jeffrey A. DeVree</u> and <u>Elizabeth K. Bransdorfer</u>, for
petitioners.

<u>Terry L. Zabel</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following
deficiencies in and additions to petitioners' Federal
income tax for the years in issue:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6653(a)(1) |
| 1987 | $10,571.00 | $528.55 | [1] | -- |
| 1988 | 15,270.51 | -- | -- | $763.53 |
| 1989 | 12,412.00 | -- | -- | -- |
| 1990 | 6,107.00 | -- | -- | -- |
| 1991 | 15,681.00 | -- | -- | -- |

[1]Fifty percent of the interest computed under sec. 6601 with respect to the portion of the underpayment which is attributable to negligence.

Unless otherwise stated, all section references are to the Internal Revenue Code as in effect during the years in issue. After concessions, the issues remaining for decision are: (1) Whether petitioners' farming activity during the years in issue was an "activity not engaged in for profit" within the meaning of section 183; and (2) whether petitioners are liable for the additions to tax for negligence prescribed by section 6653(a)(1)(A) and (B) with respect to their 1987 return, and the addition to tax for negligence prescribed by section 6653(a)(1) with respect to their 1988 return.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplement to stipulation of facts, and exhibits attached to each are incorporated herein by this reference. Petitioners are

husband and wife who filed a joint Federal income tax return for each of the years in issue. Respondent issued two notices of deficiency to petitioners. In the first notice, respondent determined deficiencies and additions with respect to petitioners' 1989, 1990, and 1991 returns. In the second notice, respondent determined deficiencies and additions with respect to petitioners' 1987 and 1988 returns. Petitioners filed two petitions for redetermination, one petition to dispute each notice of deficiency. The Court subsequently consolidated these cases for trial, briefing, and opinion pursuant to Rule 141. All Rule references are to the Tax Court Rules of Practice and Procedure. At the time they filed their petitions in these consolidated cases, petitioners resided in Calhoun County, Michigan. All references to petitioner in this opinion are to Mr. Robert E. Holmes.

Petitioner holds a bachelor's degree in business administration with minors in economics and small business management. In 1956, petitioner began working as a salesman for State Farm Mutual Insurance Co. (State Farm) in Battle Creek, Michigan. In 1961, he was promoted to district sales manager. Petitioner held that position from the time of his promotion up to and including the time of trial. Forms W-2, Wage and Tax Statements, issued to

petitioner reported the following wages, tips, and other compensation from his employment with State Farm during the years in issue:

| Year | Compensation |
|------|--------------|
| 1987 | $188,435.47 |
| 1988 | 190,949.62 |
| 1989 | 211,946.06 |
| 1990 | 188,581.07 |
| 1991 | 186,605.22 |

## Real Property and Related Activities

Sometime during the late 1970's, petitioners purchased approximately 5 acres of real estate located in Calhoun County, Michigan (the 5-acre parcel). Shortly after purchasing the property, petitioners constructed a house on the property which they used as their personal residence during each of the years in issue.

Circa 1981, petitioners purchased approximately 40 acres of real estate (the 40-acre parcel) contiguous to the 5-acre parcel. Prior to petitioners' purchase of this 40-acre parcel, the previous owner had raised cattle on the land. According to the depreciation schedules attached to their returns, petitioners claimed an aggregate basis of $45,000 in the 40- and 5-acre parcels.

In 1986, petitioners began to consider the feasibility of purchasing additional real estate near their home. Mr. Edgar Puthuff owned a 300-acre plot which bordered petitioners' 5- and 40-acre parcels.  Mr. Timothy VandenHeede, a neighboring farmer and personal friend of petitioner, had previously raised corn on portions of the 300-acre plot.  After discussions with Mr. VandenHeede regarding the purchase and economic feasibility of farming the land, petitioner and Mr. VandenHeede agreed to order a survey of the entire 300-acre plot.  Petitioner also discussed the possible purchase of this additional real estate with Mr. Mike Robinson, a local farmer, and with representatives of the local Agriculture Stabilization Control (ASC) office.

Later in 1986, petitioner and Mr. VandenHeede each purchased a portion of the 300-acre plot.  Petitioners purchased 120 acres (the 120-acre parcel) contiguous to the 5- and 40-acre parcels, and Mr. VandenHeede purchased the remaining 180 acres.  The 120-acre parcel which petitioners purchased consisted of crop land, timberland, and some wet-land.  At the time of the purchase, petitioners intended to farm a portion of the 120-acre parcel.  According to the depreciation schedules attached to their returns,

petitioners claimed a basis of $50,000 in the 120-acre parcel.

Petitioners engaged in a variety of activities on the 5-, 40-, and 120-acre parcels during the years in issue, including growing Christmas trees, raising fish, preparing timber for harvest, and planting row crops. Petitioners also placed a portion of the property in various Government subsidy programs, received disaster relief payments in connection with a portion of the land, and made depreciable improvements to the land. Petitioners treated these activities as "farm activities" and reported the following income and expenses from these activities for the years in issue:

|  | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|
| **Income:** |  |  |  |  |  |
| Sale of livestock and produce |  |  |  |  |  |
|    Corn | -- | $423 | -- | $2,927 | -- |
|    Soybeans | $459 | -- | -- | -- | -- |
|    Hay and straw | -- | -- | $2,000 | -- | -- |
|    Miscellaneous | -- | -- | -- | 525 | $1,729 |
| Insurance proceeds | -- | -- | 514 | 938 | 938 |
| ASCS Payments | -- | -- | -- | 3,148 | -- |
| Rental/crop income | -- | -- | -- | -- | 5,900 |
| Federal and state gasoline fuel tax credit or refund | 18 | 19 | 89 | -- | -- |
| Agricultural program payments | 3,004 | 2,537 | 2,929 | -- | 2,607 |
| Total gross income | 3,481 | 2,979 | 5,532 | 7,538 | 11,174 |
| **Expenses:** |  |  |  |  |  |
| Custom hire (machine work) | -- | -- | (4,475) | (968) | (1,381) |
| Depreciation | (4,899) | (7,700) | (7,010) | (6,109) | (5,451) |
| Fertilizers and lime | -- | (5,488) | -- | (1,800) | (1,029) |
| Freight & trucking | -- | -- | -- | (79) | -- |
| Gasoline, fuel, and oil | (1,483) | (1,426) | (309) | (324) | (193) |
| Insurance | -- | (325) | (337) | (810) | (456) |
| Interest mortgage | (12,803) | (13,385) | (12,860) | -- | -- |
| Net labor | (1,800) | (2,546) | (2,796) | (2,487) | (283) |
| Rent of farm, pasture | -- | (94) | -- | -- | -- |
| Machine hire | (2,090) | -- | -- | -- | -- |
| Repairs & maintenance | (2,793) | (7,482) | (3,679) | (2,164) | (3,685) |
| Seeds, plants purchased | (2,673) | (3,850) | -- | (583) | -- |
| Supplies purchased | (2,103) | (9,785) | (2,090) | (1,021) | (1,789) |
| Taxes | (5,563) | (5,698) | (10,639) | (12,103) | (1,404) |
| Utilities | -- | (120) | (389) | -- | -- |
| Other expenses |  |  |  |  |  |
|    Vehicle | (1,620) | (1,728) | (1,632) | -- | -- |
|    Misc. | (2,142) | (1,145) | (536) | (302) | (873) |
|    Telephone | -- | -- | (393) | -- | -- |
|    Planting | (5,263) | (2,224) | -- | -- | -- |
|    State Farm interest | (7,914) | (4,226) | (455) | (1,222) | -- |
|    Great Lakes interest | -- | -- | -- | (12,209) | (6,256) |
|    Dues & subscriptions | -- | -- | -- | (20) | (124) |
|    Other insurance | -- | -- | -- | -- | (158) |
|    Professional | -- | (543) | (527) | (547) | (350) |
|    Casual labor | -- | -- | -- | -- | (2,120) |
|    Postage | -- | -- | -- | -- | (9) |

|  | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|
| Office | -- | -- | -- | (162) | -- |
| Advertising | (13) | -- | -- | -- | -- |
| Net income (loss) | (49,678) | (64,786) | (42,595) | (35,372) | (14,387) |

In 1992 and 1993, petitioners incurred net losses from these activities in the amounts of $12,847 and $14,140, respectively.

For 1987, 1988, and 1989, petitioners reported the above losses on Schedules F, Farm Income and Expenses, that are attached to their individual income tax returns for those years. For 1990 and 1991, petitioners treated their "farm activities" as having been conducted through a partnership, R.C. Enterprises (RC), in which each of them held a 50-percent interest. The partnership reported the income and expenses from petitioners' farm activities on Schedules F attached to the partnership's returns for 1990 and 1991. Petitioners then reported their distributive shares of the partnership losses on Schedules E, Income or Loss From Partnership and S Corporation, filed with their individual returns for those years.

The following is a discussion of each of the activities that petitioners undertook in connection with their land.

## Fish Raising

Sometime prior to 1987, after reading articles in a local trade magazine and attending at least one seminar at the Michigan State Biological Station, petitioner began to raise fish in two ponds located on his property. It is unclear from the record whether these ponds were on the property at the time of petitioners' acquisition or whether petitioner constructed one or both of them himself.

Petitioner began his fish-raising activity by digging small holes on the property to determine whether the ponds would hold water. Petitioner then tested the temperature of the water in the ponds to determine whether fish could survive in them. After concluding that the water was suitable for raising fish, petitioner enlarged both ponds and covered the bottoms with lining material. Petitioner then purchased approximately 100 trout for approximately $1.75 to $2.50 each, and an undisclosed number of catfish for approximately 10 cents each, to stock the ponds. Petitioner placed the trout in the smaller of the two ponds and the catfish in the other pond. At the time he purchased these fish, petitioner expected that he could sell the trout after they matured for somewhere between

$2.50 and $4.95 per pound, and the catfish for somewhere between $1.50 and $2.50 each.

Sometime after petitioner stocked the ponds, all of the fish died due to hot weather. Petitioner then put more fish in the ponds and attempted to keep them alive by pumping cool well water into the ponds. This was marginally successful, and in 1990, petitioners were able to harvest some fish which they sold for a total of $525. At some point, however, the pumps failed and a portion of the remaining fish died due to high water temperature. Petitioner then inserted a pipe connecting the small trout pond to the larger catfish pond to regulate the water temperature in both ponds. Petitioner also installed electric aerators in the ponds to increase the amount of oxygen in the water, and constructed a deck leading to the middle of the larger pond to transport electricity to the aerators. Additionally, petitioner purchased and installed a windmill to operate a plunger designed to draw cool water from the ground into one of the ponds. This plunger system was not operational at the time of trial.

Petitioners' fish-raising activity was never profit-able. Petitioners paid a total of $7,190 for improvements

to the ponds, which they are depreciating over a period of 19 years.  Petitioners reported income of $525 from the sale of fish in 1990, but they did not report any income from the fish-raising activity in any of the other years in issue.  Although there were no fish in either of the ponds at the time of trial, petitioner planned to restock the ponds once the windmills and plungers were operational.

Christmas Trees

Sometime prior to 1987, after consulting representatives of the local Soil Conservation Service (SCS) office, petitioner decided to plant Christmas trees on his property.  Petitioner had gained some experience harvesting and selling Christmas trees while working on his father's property as a young man.

Sometime after 1987, petitioner borrowed a tree-planting device from the SCS and planted 500 to 1,000 trees on his property.  Petitioner planted more trees in subsequent years in an attempt to establish a continuous rotating crop.  Petitioner planted these trees in rows approximately 5 feet apart.  Some of the trees are planted

under overhead wires. Some of the trees are visible from petitioners' house.

In addition to the cost of the trees, petitioner incurred costs for herbicide and trimming services. At trial, petitioner estimated that Christmas trees were growing on approximately 15 of his 165 acres, but he was unable to estimate the total number of trees growing on his property. Petitioner did not harvest or sell any trees during any of the years in issue but thought that he could begin harvesting trees approximately 2 years after the time of trial.

Timber

Sometime between 1986 and 1988, petitioner began considering the prospect of selling timber located on the 120-acre parcel. Petitioner had obtained some experience harvesting and selling timber after his father died, when he sold trees that were growing on his father's land. Petitioner spent some time during the years in issue removing dead, crooked, and otherwise unwanted trees and brush from his property in an attempt to manage the timberland. However, petitioner did not harvest or sell

any of the trees on his property during any of the years in issue.

Row Crops and Government Subsidy Programs

Shortly after purchasing the 40-acre parcel, petitioner spoke with Mr. VandenHeede, who suggested that petitioner contact the local ASC office about the possibility of placing a portion of the land in the Conservation Reserve Program (CRP).  The CRP is a program controlled by the U.S. Department of Agriculture (USDA) on behalf of the Commodity Credit Corp., the SCS, and the U.S. Forest Service.  Under the CRP, the USDA pays an owner or operator of eligible crop land an annual rental fee in exchange for the owner's or operator's agreement to use his or her land in conformance with the USDA's direction.  The amount of annual rental payments under the CRP are based on bids submitted by the owners or operators of the land.  CRP contracts are generally effective for terms of 10 or 15 years.

When specific property is accepted into the CRP, the SCS develops a comprehensive plan for managing the land. Typically, the SCS requires the owner or operator to

establish a permanent cover of grass and/or other vegetation on the land in lieu of cultivating row crops such as corn. This is intended to prevent erosion of the soil. The USDA pays one-half of the expenses incurred in establishing this permanent cover and provides technical assistance to the owner or operator through the SCS, conservation districts, U.S. Forest Service, State forestry agencies, and other agencies.

On May 5, 1986, petitioner signed a contract placing 14.3 acres of the 40-acre parcel in the CRP at an annual rental rate of $57 per acre. This agreement was to be effective until 1996. A representative of the Commodity Credit Corp. approved the contract on or about August 5, 1986.

In 1987, after discussions with Mr. VandenHeede, Mr. Robinson, and Mr. Douglas Jackson, petitioners' accountant, regarding the economic feasibility of farming the land, and after obtaining information from the local Agriculture Stabilization and Conservation Service (ASCS), petitioner hired Mr. Robinson as an independent contractor to till, plant, and harvest row crops on a portion of the 120-acre parcel. Mr. Robinson continued to work for

petitioners through 1990 pursuant to subsequent annual agreements. Effective for the 1987 crop year, the Calhoun County ASCS Committee designated 36.3 of petitioners' total 165 acres as "cropland".

Petitioners planted crops on 23.6 acres during 1987, including 13.6 acres of corn and 10 acres of soybeans. Petitioners harvested 518 bushels of corn in 1987 but did not report any gross income from the sale of corn in that year. Petitioners reported gross income of $459 from the sale of soybeans in 1987. The record of this case does not set out the number of bushels of soybeans harvested or the price per bushel petitioners received. Petitioners also reported gross income of $3,004 from Government subsidy payments received in 1987.

In 1988, petitioners participated in the "0-92 program". The ASCS pays a landowner who participates in this program a specified amount of money per acre per year in exchange for the landowner's agreement to refrain from planting crops on anywhere from zero to 92 percent of his or her total eligible acreage. The record does not disclose the amount of money petitioners received under the 0-92 program during 1988. However, petitioners reported

gross income from agricultural program payments in 1988 of $2,537.

In their "Report of Acreage" to the local ASCS office for 1988, petitioners reported that they held a total of 57.1 acres of "cropland". Petitioners did not plant or harvest any corn on their property during 1988. However, petitioners reported gross income from the sale of corn in 1988 of $423. Although petitioners planted oats on 15.3 acres of their property in 1988, they did not harvest or sell any oats during that year.

A letter from the Calhoun County ASCS office to petitioner dated July 23, 1989, states that 50.6 of petitioners' 165 acres was considered "cropland". On or about July 24, 1989, petitioners signed a contract placing 22.4 acres into the CRP at an annual rental rate of $60 per acre. This is in addition to the 14.3 acres placed in the CRP in 1986. A representative of the Commodity Credit Corporation approved this contract on or about December 13, 1989. This agreement was to be effective from 1990 to 1999.

Petitioners planted corn on 19 acres of their property during 1989 and harvested a total of 917 bushels.

Additionally, petitioners planted soybeans on 13.1 acres and harvested 126 bushels.  Petitioners did not plant or harvest any oats during 1989.  Although petitioners did not report any gross income from the sale of corn in 1989, they did report $2,000 as gross income from the sale of hay and straw.

Petitioners planted 11.1 acres of corn in 1990, producing a total harvest of 164 bushels.  Petitioners did not plant or harvest any soybeans or oats in 1990. Petitioners reported gross income from the sale of corn in 1990 of $2,927.  Petitioners did not plant any row crops on their property during 1991 or 1992, but they reported gross income of $1,729 from the sale of miscellaneous livestock and produce in 1991.

The average corn yields for farms in Calhoun County, Michigan, and petitioners' average corn yields during the years in issue are as follows:

| Year | Average Bushels/Acre | Petitioners' Average Bushels/Acre |
|------|------|------|
| 1987 | 79.1 | 38.09 |
| 1988 | 56.9 | -- |
| 1989 | 112.1 | 48.26 |
| 1990 | 119.4 | 14.78 |
| 1991 | 94.9 | -- |

The above averages for farms in Calhoun County include both irrigated and nonirrigated farms, whereas petitioners' farm was nonirrigated.  A letter dated November 5, 1990, from the Michigan Department of Natural Resources (MDNR) to petitioner states that the township of Marshall, where petitioners' land was located, had experienced significant crop damage caused by deer for several years.  Accordingly, in 1990, the MDNR issued a permit to petitioner authorizing him to kill antlerless deer on his property.

Petitioner received disaster assistance payments during the years in issue.  The ASCS sent a letter dated January 3, 1992, to petitioner concerning the Disaster Assistance Program for 1990 and 1991.  It is apparent from this letter that petitioners had applied for disaster assistance of some sort.  A letter dated March 26, 1992, from the local ASCS office to petitioners states that petitioners' application for disaster relief with respect to their crop loss was approved.  However, the record does not disclose the nature or extent of petitioners' crop loss or the amounts of disaster assistance payments they received.

Depreciable Improvements and Equipment

Petitioners made various improvements to their land during the years in issue.  These included constructing a pole barn, purchasing and installing grain bins to store crops after they are harvested, improving a driveway, installing gates and fences, and lining the beds of the ponds.  Petitioners also purchased items of equipment related to their various activities, including a chain saw, a tractor, and other farm equipment.  The depreciation deductions claimed on the Schedules F, Farm Income and Expenses, filed with petitioners' returns for 1987, 1988, and 1989, and on the Schedules F filed with the returns for R.C. Enterprises for 1990 and 1991, are based upon the following improvements, additions, and items of equipment:

|                      | Cost Basis | Depreciation Deductions | | | | |
|                      |            | 1987  | 1988  | 1989  | 1990  | 1991  |
|----------------------|-----------|-------|-------|-------|-------|-------|
| Gates and fencing    | $2,971    | $594  | $594  | $594  | $594  | $119  |
| Pole barn            | 12,756    | 676   | 676   | 676   | 676   | 676   |
| Pond liner           | 7,190     | 381   | 381   | 381   | 381   | 381   |
| Equipment (tractor)  | 12,948    | 1,850 | 3,171 | 2,265 | 1,617 | 1,156 |
| Water tank           | 806       | --    | 86    | 206   | 147   | 101   |
| Equipment            | 1,496     | --    | 160   | 382   | 273   | 187   |
| Plow disc 280 winch  | 1,013     | --    | --    | 72    | 145   | 145   |
| Chain saw            | 491       | --    | --    | --    | --    | 35    |
| Mill                 | 1,500     | --    | --    | --    | --    | 107   |
| Grain bins           | 2,483     | 248   | 447   | 358   | 286   | 358   |
| Lights               | 2,188     | --    | --    | 109   | 219   | 219   |
| Driveway addition    | 23,004    | 1,150 | 2,185 | 1,967 | 1,771 | 1,967 |
| Total                | 68,846    | 4,899 | 7,700 | 7,010 | 6,109 | 5,451 |

## Hunting Lodge

Prior to 1990, petitioners constructed a building directly across the driveway from their house at a cost of approximately $97,000.  This building is approximately 40 feet by 20 to 30 feet and consists of a ground floor and a basement.  The ground floor is decorated like a hunting lodge, with mounted heads of game on the walls and a bearskin rug on the floor of the main room.  Petitioner used this building on one occasion during the years in issue as a meeting place for State Farm agents.

## Other Business Activities

Petitioners were involved in various business activities other than those mentioned above both before and during the years in issue.  Sometime prior to 1987,

petitioners invested in a shopping mall called the Holt Shopping Center. Petitioners did not create a formal business plan or cost analysis prior to investing in this venture. Petitioners reported the following income from their investment in the shopping center during the years in issue:

| Year | Total Income | Miscellaneous Income |
|------|--------------|----------------------|
| 1987 | $17,359 | $2,400 |
| 1988 | 21,835 | 2,200 |
| 1989 | 16,440 | 2,600 |
| 1990 | 17,205 | 2,400 |
| 1991 | 18,156 | 2,400 |

Petitioners also invested in residential property in Florida, including a "tennis villa" and a "resort villa". The record does not disclose the precise nature of these investments or the income or loss realized from them.

Sometime in 1990, Mrs. Holmes opened a retail clothing business. Petitioners reported a loss from this business in the amount of $584 in 1990 and a profit of $179 in 1991.

## Petitioners' Bookkeeping Practices

Virtually all of petitioners' business and investment activities, including the tennis villa and the resort villa, were conducted through RC. In 1990, pursuant to

Mr. Jackson's advice, petitioners also began reporting the losses from their farming activities on RC's partnership tax returns.

Petitioners maintained a checking account with the Chemical Bank-South (Chemical) for their tennis villa, resort villa, and farming activities. This bank account was separate from petitioners' personal bank accounts. Petitioners typically paid expenses incurred in their farming activity with checks drawn on the Chemical account, but it is not clear from the record when this practice began. These checks were imprinted with the name "R/C ENTERPRISES" and the address of petitioners' personal residence. Petitioners also periodically paid expenses related to their farming activity with checks drawn on their personal checking account.

Mrs. Holmes was primarily responsible for keeping the books and writing checks to pay expenses relating to petitioners' business and farming activities. When petitioners received a bill, petitioner would typically inspect the bill and write "labor", "machinery", or some other designation on the portion to be retained for petitioners' records. He would then give the bill to Mrs. Holmes to pay and record. Mrs. Holmes would then allocate the expense to one of petitioners' business

activities, record the bill on a ledger, and write a check to pay the amount due. Petitioners introduced one page of their 1987 ledger and all pages of their 1988 ledger into evidence. There is no documentary evidence in the record of petitioners' bookkeeping practices for the remainder of 1987 or any portion of 1989 through 1991.

Petitioners conceded at trial that check No. 1004 drawn on RC's Chemical account and made payable to Chapman Nursery & Landscaping in the amount of $2,250, which was entered into their 1987 cash disbursements journal as a "farm expense", was actually a personal expense incurred for landscaping around their house. Petitioners also conceded that check Nos. 1134 and 1215 drawn on RC's Chemical account and made payable to Brian Minto in the amounts of $455.68 and $309.62, respectively, which were entered in petitioners' ledger as farm expenses for 1988, were actually used to pay personal expenses.

## Respondent's Examination

In May 1990, Revenue Agent Paul Przytulski visited petitioners' property in conjunction with his audit of their 1987 and 1988 returns. During this visit, Mr. Przytulski noticed many deer tracks on the property, several wooden boxes near the ponds which contained some

sort of feed, and several salt licks in or around the wooded areas. After he toured the property, Mr. Przytulski asked Mr. Jackson, petitioners' accountant, for invoices and receipts to support petitioners' canceled checks. In response, Mr. Jackson offered Mr. Przytulski a disorganized assortment of documents. Although Mr. Przytulski asked Mr. Jackson to organize the documents, he never received the documentation he requested in an organized format.

In April 1992, Revenue Agent Robert Cole visited petitioners' property in conjunction with his audit of their 1989 through 1991 returns. After touring the property, Mr. Cole asked Mr. Jackson to produce documents to support petitioners' deductions during those years. Once again, Mr. Jackson offered Mr. Cole a box of disorganized records which included documents relating to all of petitioners' checking accounts, including their personal accounts. Petitioners never provided Mr. Cole with a summary reconciling their tax return entries with the documents they produced.

## OPINION

### Section 183

The primary factual issue in this case is whether petitioners' farming activity was an "activity not engaged

in for profit" within the meaning of section 183.  Section 183(a) provides that no deduction attributable to an activity which is not engaged in for profit is allowable except as provided in section 183(b).  Section 183(b)(1) allows all deductions which would be allowable without regard to whether the activity is engaged in for profit. Section 183(b)(2) allows a deduction equal to the amount of the deductions that would be allowable for the taxable year if such activity was engaged in for profit, but only to the extent the gross income derived from the activity exceeds the deductions allowable under section 183(b)(1).

Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or paragraph (1) or (2) of section 212."  The key requirement for deductibility under sections 162 and 212(1) and (2) is that the taxpayer be engaged in the activity with an actual and honest objective of making a profit.  See Dreicer v. Commissioner, 78 T.C. 642, 644 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); Brannen v. Commissioner, 78 T.C. 471, 502 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Allen v. Commissioner, 72 T.C. 28, 33 (1979).  Although a taxpayer need not have a reasonable expectation of earning a profit,

- 26 -

a bona fide profit objective must exist.  See <u>Keanini v.</u>
<u>Commissioner</u>, 94 T.C. 41, 46 (1990); <u>Hulter v. Commis-</u>
<u>sioner</u>, 91 T.C. 371, 393 (1988); <u>Beck v. Commissioner</u>, 85
T.C. 557, 569 (1985); <u>Dreicer v. Commissioner</u>, <u>supra</u>;
<u>Golanty v. Commissioner</u>, 72 T.C. 411, 425-426 (1979), affd.
without published opinion 647 F.2d 170 (9th Cir. 1981);
sec. 1.183-2(a), Income Tax Regs.  "Profit" in this context
means economic profit, independent of tax savings.  See
<u>Antonides v. Commissioner</u>, 91 T.C. 686, 694 (1988), affd.
893 F.2d 656 (4th Cir. 1990); <u>Landry v. Commissioner</u>, 86
T.C. 1284, 1303 (1986).

Whether a taxpayer engages in an activity with the
requisite profit motive is a question of fact to be
resolved on a consideration of all the facts and circum-
stances in the record.  See <u>Lemmen v. Commissioner</u>, 77
T.C. 1326, 1340 (1981); <u>Allen v. Commissioner</u>, <u>supra</u> at
34; sec. 1.183-2(b), Income Tax Regs.  Petitioners bear
the burden of proving that they engaged in their farming
activity with the requisite profit motive, and greater
weight is given to objective facts than to the taxpayer's
mere statement of intent.  See Rule 142(a); <u>Siegel v.</u>
<u>Commissioner</u>, 78 T.C. 659, 699 (1982); <u>Churchman v.</u>
<u>Commissioner</u>, 68 T.C. 696, 701 (1977); sec. 1.183-2(a),
Income Tax Regs.

## Single Activity

In order to apply section 183 and the regulations promulgated thereunder, the activity or activities of the taxpayer must be ascertained.  Sec. 1.183-1(d)(1), Income Tax Regs.  According to the regulations under section 183, in ascertaining the activity or activities of the taxpayer, the general rule is that all the facts and circumstances of the case must be taken into account.  Id.  The regulations provide as follows:

> Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings.  Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities.  The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. * * * [Id.]

Petitioners treat their fish, Christmas tree, timber, and row crop undertakings as a single activity for section 183 purposes.  Respondent does not suggest otherwise. Given the economic and organizational interrelationship of

these activities, we accept petitioners' characterization.

Neither party addressed, either at trial or on brief, whether the holding of the land for its appreciation in value should be treated as a separate activity for section 183 purposes. On this point, the regulations provide in pertinent part as follows:

> Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land). [Sec. 1.183-1(d)(1), Income Tax Regs.]

The above-quoted provision of section 1.183-1(d)(1), Income Tax Regs., applies only where "land is purchased or held primarily with the intent to profit from increase in its value". See Engdahl v. Commissioner, 72 T.C. 659, 668 n.4 (1979); Hoyle v. Commissioner, T.C. Memo. 1994-592; sec. 1.183-1(d)(1), Income Tax Regs. Because it does not appear that petitioners' primary intent was to profit from

appreciation in the value of the land, the general rule of the regulations is applicable in this case. See <u>Hoyle v. Commissioner</u>, <u>supra</u>. Under that rule all facts and circumstances must be taken into account in determining whether there is a single activity. Sec. 1.183-1(d)(1), Income Tax Regs. On the basis of all the facts and circumstances of this case, we find that all of petitioners' activities, including holding the land, should be treated as a single activity for section 183 purposes.

## Factors Relating to Petitioners' Farm Activity

Section 1.183-2(b), Income Tax Regs., lists the following factors relevant to determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation

involved. These factors are not exclusive, and no single factor or combination of factors is conclusive in determining whether an activity is engaged in for profit. See Dreicer v. Commissioner, 78 T.C. at 645; Vandeyacht v. Commissioner, T.C. Memo. 1994-148; sec. 1.183-2(b), Income Tax Regs. After considering the facts and circumstances of this case, we conclude that petitioners did not engage in their "farming" activity for profit. We discuss each of these factors separately.

(1) Manner of Carrying on the Activity

Section 1.183-2(b)(1), Income Tax Regs., provides as follows:

> The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated. A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive.

Petitioners contend that they maintained reasonably complete and accurate books and records of their farming activity compared to other farmers in the locality and to their other business activities. Petitioners' accountant,

Mr. Jackson, testified that petitioners' books and records were at least as complete and accurate as his other farmer clients'. However, petitioners never turned their books and records over to the revenue agents in an organized fashion as requested and introduced only one page of their 1987 ledger and all pages of their 1988 ledger into evidence. Petitioners did not introduce any documentary evidence of their record-keeping practices for the remainder of 1987 or 1989 through 1991. Petitioner also testified that petitioners sometimes paid farming expenses with checks from their personal bank accounts. Moreover, petitioners conceded that one check entered on their 1987 ledger as a farm expense and two entered on their 1988 ledger as farm expenses were actually used to pay personal expenses. Respondent's agent testified that petitioners' books and records were generally poor compared to those maintained by the other farmers he had audited, and we find his testimony credible. On the basis of the record of this case, we cannot find that petitioners maintained complete and accurate books and records.

We note that petitioners planted different row crops in 1988 from those cultivated in 1987, purchased bins to store grain, erected fences and gates to keep neighbors' cattle off their land, installed aerators and other devices

in the ponds to help fish survive, and placed property in Government subsidy programs. Petitioners also abandoned their efforts to raise a crop on their land altogether after they realized it would be unprofitable to do so.

(2)  Expertise of the Taxpayer or His Advisers

Section 1.183-2(b)(2), Income Tax Regs., provides in pertinent part as follows:

> Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are experienced therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices.  * * *

Although Mrs. Holmes lived on a farm as a child and petitioner occasionally worked on his father's farm, neither of them had any professional experience in farming. However, petitioner did consult with neighboring farmers, the local ASC office, and his accountant prior to commencing his farming activities.  Petitioner also had some limited experience in growing, harvesting and selling Christmas trees and timber.  Finally, petitioner testified that he attended at least one seminar at the Michigan State Biological Station on raising fish and regularly read local trade magazines.

(3)   Time and Effort Expended by the Taxpayer

Section 1.183-2(b)(3), Income Tax Regs., provides in pertinent part as follows:

> The fact that the taxpayer devotes much of his
> personal time and effort to carrying on an
> activity, particularly if the activity does
> not have substantial personal or recreational
> aspects, may indicate an intention to derive a
> profit.  A taxpayer's withdrawal from another
> occupation to devote most of his energies to the
> activity may also be evidence that the activity
> is engaged in for profit.  The fact that the
> taxpayer devotes a limited amount of time to an
> activity does not necessarily indicate a lack
> of profit motive where the taxpayer employs
> competent and qualified persons to carry on
> such activity.

Petitioner held a full-time job as district sales manager for State Farm throughout the years in issue. Given petitioner's high salary, it is reasonable to conclude that this required a large expenditure of petitioner's time and energy.  We note that petitioner testified that he spent a great deal of time in the evenings and on weekends working on his "farming" activity. He testified that he constructed gates and fences on the property, cleared the fields of rocks and other debris, constructed a pole barn for storing farm equipment, and helped in constructing a driveway, planting Christmas trees, and improving the ponds.  However, we note that the

land on which this work was done is contiguous to the land on which petitioners maintain their personal residence. We believe that some of this work contributed directly or indirectly to the enjoyment of petitioners' residence. Furthermore, while petitioner hired Mr. Robinson, an experienced farmer, to cultivate row crops on a portion of his land, petitioner did not cultivate row crops on the property during all of the years in issue.

(4)  Expectation That Assets Used in the Activity
     May Appreciate in Value

Section 1.183-2(b)(4), Income Tax Regs., provides as follows:

> The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity.  Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of the land will exceed the expenses of operation. * * *

According to the depreciation schedules attached to petitioners' returns, it appears that petitioners paid $95,000 for their land and more than $68,000 for the improvements and equipment used in connection with their farm activity.  Petitioners make a general argument that

the assets used in connection with their farm activity, including their land and farm equipment, had appreciated in value. The only evidence in the record of appreciation is Mr. Jackson's uncorroborated testimony that farmland located near petitioners' land was sold in 1990 for "$94,000 for I think it was 10 acres", and that farm equipment sometimes appreciates in value. We find Mr. Jackson's testimony to be vague and too general to be helpful. Moreover, the record contains no objective evidence of the value of petitioners' land or farm equipment at the end of the years in issue or at any other point, and there is nothing in the record to show that appreciation of petitioners' land and farm equipment would bring about an "overall profit" from petitioners' activity. See sec. 1.183-2(b)(4), Income Tax Regs.

(5) Success in Other Similar or Dissimilar Activities

Section 1.183-2(b)(5), Income Tax Regs., provides as follows:

> The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.

Petitioners have never engaged in any undertakings similar to their "farming" activity. However, petitioners have been successful in several dissimilar business activities. Sometime prior to the years in issue, petitioners purchased an interest in a shopping center which consistently generates a profit. Petitioners also invested in a tennis villa, a resort villa, and other residential property in Florida, but there is no documentary evidence in the record to substantiate petitioners' vague testimony that they realized profits from these activities. Additionally, Mrs. Holmes owns a retail clothing business which incurred a loss of $584 in 1990 and realized a profit of $179 in 1991.

Although we recognize that petitioners may have been successful with respect to dissimilar activities in the past, this does not indicate that they are engaged in their farming activity for profit. Petitioners have realized significant losses from that activity during the years in issue and thereafter. Moreover, petitioners' residence is located on a portion of their property and it is reasonable to conclude that some part of the expenditures at issue benefited petitioners' residence or petitioners' enjoyment of their residence.

(6)  <u>History of Income or Loss With Respect to the Activity</u>

Section 1.183-2(b)(6), Income Tax Regs., provides in pertinent part as follows:

> A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit.  However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit.  If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity, is not engaged in for profit.  * * *

Petitioners reported significant losses during each of the years in issue.  Petitioners make the general contention that these losses were caused by "unanticipated start-up expenses, drought, deer damage, and other unusual and unexpected circumstances."  However, petitioners make no attempt to quantify the losses that they claim are attributable to each of these causes.  For example, petitioners do not enumerate specifically what startup expenses were unanticipated.  Similarly, the record does not state whether the drought to which petitioners make reference took place during the years in which they planted

crops or the years in which they did not plant crops. Moreover, it appears that petitioners received "disaster relief payments" during the years at issue which may have ameliorated petitioners' losses from any such drought. Finally, while petitioners introduced evidence that farmers in the area suffered from "deer depredation", they introduced no evidence that damage caused by deer contributed to their losses. To the contrary, the record suggests that there were salt licks on the property to attract deer and other animals.

(7) Amount of Occasional Profits

Section 1.183-2(b)(7), Income Tax Regs., provides that occasional profits may evidence a profit motive. Petitioners' farming activity never generated a profit during any of the years in issue.

(8) Financial Status of the Taxpayer

Section 1.183-2(b)(8), Income Tax Regs., provides as follows:

> The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit

especially if there are personal or recreational elements involved.

Petitioner realized substantial income from sources other than the farming activity during the years in issue. Petitioner worked as a district sales manager for State Farm during the years in issue, earning an average of approximately $193,000 per year in wages.  Petitioners also received income from their investment in the Holt Shopping Center of approximately $20,000 per year.  This, combined with the fact that their farming activity generated aggregate losses of $206,000 over the years in issue, strongly indicates that petitioners did not engage in their farming activity with an actual and honest objective of earning a profit.  See Sutton v. Commissioner, 84 T.C. 210, 222-226 (1985), affd. 788 F.2d 695 (11th Cir. 1986), affd. sub nom. Knowlton v. Commissioner, 791 F.2d 1506 (11th Cir. 1986); Golanty v. Commissioner, 72 T.C. 411, 426-429 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Jasionowski v. Commissioner, 66 T.C. 312, 322 (1976); Vallette v. Commissioner, T.C. Memo. 1996-285; Hoyle v. Commissioner, T.C. Memo. 1994-592.

(9)  Elements of Personal Pleasure or Recreation

Section 1.183-2(b)(9), Income Tax Regs., provides in pertinent part as follows:

> The presence of personal motives in [the] carry-ing on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved.  On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit.  It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits. * * *  An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit.  Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph.

Petitioners argue that they "did not derive any significant personal pleasure or recreational benefits from the farming activity [and that] they did not use the farmland for recreational purposes."  However, petitioners' home was located on the same land, and there are numerous opportunities for petitioners, members of their family, and guests to obtain recreational or personal pleasure from the

expenditures that form the basis of the subject losses. For example, respondent's agent testified that he saw salt licks and deer tracks near wooded areas on the property and wooden boxes containing some sort of feed near the ponds. Although petitioner testified that he did not hunt on his land, it is evident that he made some effort to attract wildlife to the property.

We also note that the building petitioners claim to have constructed for State Farm meetings resembles a hunting lodge more than a business office. Further, petitioner testified that only one State Farm meeting was held in the building. Moreover, although petitioner testified that he did not eat fish, he admitted that his family had eaten fish taken from the ponds. In light of all these circumstances, we find that petitioners derived an element of recreational and personal benefit from their farming activity.

In light of all of the facts and circumstances of this case, we sustain respondent's determination that petitioners' farming activity was an "activity not engaged in for profit" within the meaning of section 183. We

therefore sustain respondent's adjustments to petitioners' tax for the years in issue.

## Additions to Tax for Negligence

Respondent determined that petitioners are liable for the additions to tax for negligence prescribed by section 6653(a)(1)(A) and (B) with respect to their 1987 return and section 6653(a) with respect to their 1988 return.  Section 6653(a)(1)(A), in effect for 1987, and section 6653(a), in effect for 1988, each imposed an addition to tax equal to 5 percent of an underpayment in tax if any part of such underpayment is due to negligence or disregard of rules or regulations.  Section 6653(a)(1)(B), as in effect for 1987, imposed an addition to tax equal to 50 percent of the interest payable on the portion of an underpayment which is attributable to negligence.

Generally, negligence is defined as "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances."  Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and revg. in part 43 T.C. 168 (1964)).  Petitioners

bear the burden of proving that respondent's determination of negligence is incorrect. See Neely v. Commissioner, supra at 947-948; Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

Petitioners maintain that they provided all relevant information to their accountant and acted reasonably and in good faith in relying on his tax advice and tax return preparation. Although petitioners acknowledge that they erroneously deducted two personal expenses as farming expenses in 1987 and one in 1988, petitioners characterize these errors as a "mistakes".

Petitioners have not satisfied their burden of proving that respondent's imposition of the additions to tax for negligence is erroneous. Petitioners commingled funds for all of their business activities in a single bank account and did not maintain complete or accurate records of the activities relating to that account. Petitioners also failed to retain receipts or invoices to support their ledger entries. See sec. 6001. Petitioners also recorded several personal expenses on the books maintained for farming expenditures, and periodically paid farm expenses from their personal checking accounts. Petitioners' record

keeping was generally unbusinesslike, careless, and sloppy.

Petitioners also failed to present any substantive evidence to support their contention that they provided their accountant with complete and accurate books and records and acted reasonably and in good faith reliance on his advice.  In fact, Mr. Jackson testified that he relied on petitioners to correctly categorize their expenditures for tax purposes.  Accordingly, we sustain respondent's imposition of the additions to tax for negligence with respect to petitioners' 1987 and 1988 returns.

In light of the foregoing,

Decisions will be entered under Rule 155.